UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO. 5:22-cr-84-JA-PRL

HENRY TROY WADE

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL

The United States of America, by Roger B. Handberg, United States

Attorney for the Middle District of Florida, through the undersigned Assistant

United States Attorney, responds to Henry Troy Wade's Motion for a New

Trial under Federal Rules of Criminal Procedure 33.   Doc. 236.

## Procedural Background

On November 22, 2022, a federal grand jury indicted the defendant,

Henry Troy Wade, with six counts of wire fraud, in violation of 18 U.S.C. §

1343.   Doc. 1.   The indictment alleges that the defendant devised a scheme

to defraud the Small Business Administration ("SBA") by submitting

applications for grants and loans with the SBA's Economic Injury Disaster

Loan ("EIDL") program with false representations.

On September 24, 2024, the defendant was found guilty after a six-day

trial (Docs. 192, 195, 197, 199, 200, and 202) of all six counts of wire fraud, as

charged in the indictment.   Doc. 211-1.

On October 3, 2024, the defendant, by way of counsel, filed an unopposed motion for an extension of time to file a post-trial motion for a new trial. Doc. 220. On October 8, 2024, the defendant, by way of counsel, filed a renewed motion to extend time to file a motion for new trial and, alternatively, moved for a new trial under Rule 33(a), Federal Rules of Criminal Procedure. Docs. 221 and 223. On October 8, 2024, this Court granted the defendant's unopposed motion for an extension of time to file a motion for new trial. Doc. 224. This Court ordered that the defendant's deadline for filing the motion was October 21, 2024. *See id.*

On October 16, 2024, the defendant, by way of counsel, filed an unopposed motion for an additional extension of time to file a motion for new trial. Docs. 225-26. On October 17, 2024, this Court granted the defendant's motion for an extension of time. Doc. 227. This Court ordered that the defendant's deadline for filing the motion was November 5, 2024. *See id.*

On November 4, 2024, the defendant, by way of counsel, filed a motion for new trial. Doc. 236. The defendant argued that the defendant should receive a new trial in the interest of justice based on nine grounds. On November 6, 2024, this Court ordered the United States to respond to the defendant's motion for a new trial. Doc. 237.

## Memorandum of Law

Motions for a new trial are highly disfavored and should only be granted with great caution. *See United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (internal quotations omitted). The court may vacate a judgment and grant a new trial if the interest of justice so requires. *See* Rule 33, Fed. R. Crim. P.; see also *United States v. Pedrick*, 181 F.3d 1264, 1266-67 (11th Cir. 1999); *United States v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990). The trial court is vested with substantial discretion in determining whether to grant a motion for a new trial based on the interests of justice. *See United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994); *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).

Courts have interpreted the "interest of justice" standard as requiring a new trial where the substantial rights of the defendant have been prejudiced by errors or omissions during trial, *United States v. Stephens*, 365 F.3d 967, 976-77 (11th Cir. 2004), where there has been a deprivation of a constitutional right affecting the trial, *United States v. Arango*, 670 F. Supp. 1558 (S.D. Fla. 1987), judgment aff'd, 853 F.2d 818 (11th Cir. 1988), or where the evidence preponderates heavily against the verdict, *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985).

In deciding whether to grant a motion for new trial pursuant to the Federal Rules of Criminal Procedure, the district court must carefully weigh the evidence and may assess the credibility of witnesses, but it must not entirely usurp the jury's function or set aside the jury's verdict simply because it runs counter to the result that the district court believes is more appropriate. *See United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005). A judge's power to grant a new trial based on a different assessment of the evidence must be exercised with caution and invoked only in exceptional cases; the judge cannot entirely usurp the jury's function and set aside the verdict merely because the court would have ruled the other way. *See United States v. Crittenden*, 46 F.4th 292 (5th Cir. 2022).

## Argument

The defendant's motion for a new trial should be denied because the interests of justice do not require a new trial.

**1. Ground One: Special Agent Matthew Rosado's testimony before the grand jury does not require a new trial.**

The defendant is not entitled to a new trial based on testimony provided by Special Agent Matthew Rosado in grand jury.

A trial jury's guilty verdict renders "any error in the grand jury proceeding connected with the charging decision [ ] harmless beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986) (citing

racial discrimination in the composition of the grand jury as an exception); *see also United States v. Cosme*, 134 Fed.Appx. 391, 393 (11th Cir. 2005).

Here, the interests of justice do not require the defendant to receive a new trial based on testimony presented in grand jury. On November 22, 2022, a federal grand jury indicted the defendant after hearing testimony from Special Agent Matthew Rosado with the Secret Service. Doc. 1. On September 13, 2024, the last business day before trial, the defendant, by way of counsel, filed a motion to dismiss the indictment alleging material misrepresentations were made to the grand jury through Special Agent Rosado's testimony. Doc. 183. This Court conducted an evidentiary hearing on this issue on September 16-17, 2024. Docs. 191-92. After the hearing, this Court denied the motion to dismiss. Doc. 193. After this Court's ruling, the case preceded to trial. Doc. 192. On September 24, 2024, the jury found the defendant guilty as charged in the indictment. Even if there were errors in the grand jury, the jury's guilty verdict renders any error in the grand jury proceeding connected with the charging decision harmless beyond a reasonable doubt. Additionally, Special Agent Rosado did not testify before the jury in the trial, so his credibility and prior statements in the grand jury were never at issue in this trial. Thus, the jury's verdict was entirely independent from Special Agent Rosado's testimony in the grand jury.

The interests of justice do not require the defendant to receive a new trial based on testimony provided in the grand jury after a subsequent guilty verdict.

2. **Ground Two: The United States did not constructively amend the indictment by arguing conspiracy or aiding-and-abetting in its closing argument.**

The interests of justice do not require a new trial because the United States did not improperly amend the indictment in closing argument.

Aiding and abetting "is an alternative charge in every [federal criminal indictment], whether explicit or implicit, and the rule is well-established, both in this circuit and others, that one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted the commission of the offense." *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980); *see also Bourtzakis v. United States Attorney General*, 940 F.3d 616, 622 (11th Cir. 2019); *United States v. Thomas*, 631 F.App'x 847, 851 (11th Cir. 2015).

Here, the defendant is not required a new trial when the United States argued a legally permissible theory to the jury in closing argument. Throughout the trial, the defendant, by way of counsel, presented a defense that someone stole his identity and submitted the fraudulent EIDL loan applications without his knowledge. The defendant presented multiple

names of individuals who they argued could have submitted the applications. The United States argued that all the proceeds of the EIDL loans went directly to the defendant.   Because he was the sole beneficiary of the fraudulently obtained loan proceeds, the United States argued that the defendant – at a minimum – aided and abetted in the scheme to defraud.   This theory is consistent with every federal indictment in which aiding and abetting is an alternative charge whether explicit or implicit.

Because the United States argued a legally permissible theory that is consistent with the evidence presented at trial, the interests of justice do not require the defendant to receive a new trial.

3. **Ground Three: The United States did not distort the essential elements of the offense by arguing that the defendant could be convicted of wire fraud based on participating in a fraudulent scheme.**

In its closing argument, the United States correctly stated the essential elements of the offense as requested by the defendant (Doc. 153) and read by this Court to the jury (Doc. 200 and 207).   Thus, the interests of justice do not require a new trial.

A defendant is not entitled to a new trial if they invited the error. *See United States v. Maradiaga*, 987 F.3d 1315, 1322-23 (11th Cir. 2021) (by proposing the exact language that the district court adopted, the defendant invited any purported error, and defendant's challenge to jury

instructions was barred by the invited-error doctrine). In *Maradiaga*, the defendant not only failed to object to the jury instructions at trial, but he actually proposed the very instruction that he challenged on appeal. *See id.* The Eleventh Circuit held that the defendant could not successfully challenge an error he invited. *See id.*

Here, the United States correctly stated in its closing argument that a conviction for wire fraud can be based on a theory that the defendant participated in a scheme to defraud. On November 22, 2022, a federal grand jury charged the defendant with six counts of wire fraud, pursuant to 18 U.S.C. § 1343. Doc. 1. The Eleventh Circuit Pattern Jury Instructions for the offense of wire fraud are as follows:

> It's a Federal crime to use interstate wire, radio, or television communications to carry out a scheme to defraud someone else. The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
> (1) the Defendant knowingly devised **or participated in** a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;
>
> (2) the false pretenses, representations, or promises were about a material fact;
>
> (3) the Defendant acted with the intent to defraud; and
>
> (4) the Defendant transmitted or caused to be transmitted by [wire] [radio] [television] some communication in interstate commerce to help carry out the scheme to defraud.

Eleventh Circuit Pattern Jury Instructions, O51 (revised April 2024) (emphasis added).

On September 2, 2024, the defendant, by way of counsel, filed Defendant Henry Troy Wade's Proposed Jury Instructions. Doc. 153. The defendant proposed an instruction for the offense of wire fraud. *See id.* at 18-20. In relevant part, the defendant's proposed instruction reads:

> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
> (1) the Defendant knowingly devised **or participated in** a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;
>
> (2) the false pretenses, representations, or promises were about a material fact;
>
> (3) the Defendant acted with the intent to defraud; and
>
> (4) the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

*Id.* at 18 (emphasis added).

On September 23, 2024, this Court instructed the jury on the essential elements of the offense of wire fraud. Docs. 200 and 207. In relevant part, this Court instructed the jury:

> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly devised **or participated in** a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;

(2) the false pretenses, representations, or promises were about a material fact;

(3) the Defendant acted with the intent to defraud; and

(4) the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

Doc. 207 at 11 (emphasis added).

Because the Eleventh Circuit Patterned Jury Instructions, the defendant's own proposed jury instructions, and the instructions read to the jury before its deliberation provide an essential element of wire fraud as "the defendant knowingly devised or participated in a scheme to defraud," the United States did not err in arguing to the jury that the jury could convict the defendant based on a theory that the defendant participated in a scheme to defraud.

The interests of justice do not require the defendant to be granted a new trial based on the United States correctly instructing the jury that a wire fraud conviction can be based on a theory that the defendant participated in a scheme to defraud.

**4. Ground Four: The United States did not elicit improper expert testimony from a fact witness.**

The interests of justice do not require the defendant to receive a new trial because the United States' SBA witness, Fazile Kepadia, did not provide improper expert testimony.

The Federal Rules of Evidence provide qualifications for witnesses to meet before they can provide expert opinion testimony. *See* Rule 702, Fed. R. Evid. For expert testimony to be admissible under Rule 702, the proponent of the testimony must show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563 (11th Cir. 1998); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *United States v. Frazier*, 387 F.3d 1244, 1259-63 (11th Cir. 2004).

Here, the United States' SBA witness, Fazile Kepadia, was not offered as an expert witness, and she was not asked to provide opinion testimony under Rule 702, Federal Rules Evidence. The defendant, by way of counsel, argued in its motion for a new trial that Kepadia was asked to opine on

whether there was any indication in the SBA records that reflect identity theft. Doc. 236 at 16-17. Kepadia was asked by the United States to explain how the SBA annotates their records through comments and notes in the applicant's file. She testified that the SBA is trained to annotate whether the SBA has any suspension of identity theft. Through Kepadia, the United States introduced all records – including the notes and comments – of the EIDL loans at issue in this case. Doc. 217; *see also* United States' Trial Exhibits 1-11. Kepadia then read the notes and comments to the jury. The United States asked Kepadia to tell the jury whether there was any indication in the records that revealed whether the SBA had concerns about identity theft in these applications. This question was intended for Kepadia to summarize whether there were any annotations within the records that the SBA had suspension of identity theft. Even if this question improperly solicited an opinion from Kepadia, as the defendant argued, any error was cured by Kepadia's explanation of how the SBA annotated their records related to their suspicion of identity theft, the introduction of all the SBA records related to the defendant's applications at issue in this case, and Kepadia's reading of the notes and comments.

The interests of justice do not require a new trial when the United States did not elicit improper expert testimony from a fact witness.

**5. Ground Five: This Court did not prevent the defendant from presenting his defense.**

The interests of justice do not require the defendant to receive a new trial because this Court did not prevent the defendant from presenting his defense.   On the contrary, this Court gave the defendant great leeway in presenting its defense both in pretrial motions and during the trial.   The only limitations this Court placed on the defendant's presentation of his case are those that are legally required.

To the extent practicable, a court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.   Rule 103(d), Fed. R. Evid.   The federal rules of evidence should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination.   Rule 102, Fed. R. Evid.   Irrelevant evidence is not admissible.   Rule 401-02, Fed. R. Evid.   Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Rule 401, Fed. R. Evid.   Problems of relevancy call for an answer to the question whether an item of evidence, when tested by the processes of legal reasoning, possesses sufficient probative value to justify receiving it in evidence.   Rule 401, Notes of Advisory Committee, Fed. R. Evid.

Here, this Court did not prevent the defendant from presenting his defense. The defendant had five trial attorneys. Before trial, this Court addressed numerous, substantive defense motions, including a motion to dismiss that was filed the last business day before trial. Docs. 67 (motion to exclude evidence), 69 (motion to compel), 73 (motion to dismiss), 88 (motion to exclude evidence), 91 (motion to exclude evidence), 94 (motion to compel), 124 (motion to compel), 154 (motion to exclude evidence), 179 (motion to compel), and 183 (motion to dismiss). This Court allowed the defendant ample opportunities to present its defense through pretrial motions, including delaying trial for approximately a day and a half while a jury waited for the defendant to present evidence and argue its untimely motion to dismiss (Doc. 183). Docs. 191-92. During the six-day trial, this Court permitted the defendant to have five attorneys in the courtroom with support staff, cross examine the United States' witnesses (Docs. 192, 195, and 197), introduce exhibits (Doc. 218), and present testimony from four expert witnesses and a fact witness (Docs. 199-200). The defendant, by way of counsel, argued in his motion for new trial that he was prevented from presenting his defense because there were two types of questions the defendant was prohibited from asking of witnesses. Doc. 236 at 18-19.

First, the defendant argued that he was not allowed to ask his expert witness, Tom Simon, about caregiver fraud and identity theft. *See id.* This Court allowed Simon to sit through the entire trial to watch the presentation of evidence from the United States and defendant. Simon was presented by the defense as a summary witness with expertise in theft investigations based on his experience as a former Federal Bureau of Investigation ("FBI") special agent. This Court permitted Simon to provide expert testimony, and Simon testified from 2:59 P.M. on Friday, September 20, 2024, until 11:25 A.M. on Monday, September 23, 2024 (excluding the weekend). Docs. 199-200. Simon testified about areas of vulnerability the defendant had that made him susceptible to identity theft and caregiver fraud. Simon testified about his opinion of the investigation and evidence in this case. The defendant stated in his motion for a new trial:

> Mr. Wade was precluded from presenting various evidence in his defense against the government's charges. Namely, the Court prevented defense counsel from inquiring from expert witness Tom Simon about caregiver fraud and identity theft—two theories that are at the heart of Mr. Wade's theory of defense. These rulings made it impossible for Mr. Wade to challenge the government's improper testimony.

Doc. 236 at 18.

The motion does not allege with particularity whether there is a specific question the defendant was not allowed to ask Simon that he believes he was

legally permitted to ask. Even if this Court prevented the defendant from presenting admissible evidence from Simon, any error was cured by the evidence and arguments presented by the defendant through Simon, the defendant's other three expert witnesses, the defendant's fact witness, the defendant's exhibits, and the cross examination of the United States' witnesses.

Second, the defendant argued in its motion for new trial that it was prohibited from introducing evidence about the defendant's business locations. Doc. 236 at 18-19. Evidence of the defendant's business locations, if real, is not relevant to a defense. The defendant was charged with wire fraud based on submitting EIDL applications with false representations, to include his business locations. If the defendant were to introduce evidence that he had businesses in other locations than the locations reported to the SBA in the EIDL applications, he would have been highlighting for the jury that the information in the SBA applications was incorrect. This does not present a defense to his case. Additionally, his entire defense presented at trial was that someone else submitted the applications without his knowledge. Whether the defendant had a business location is not relevant to whether another person stole his identity and submitted EIDL applications with false representations.

The only limitations this Court placed on the defendant's presentation of his case were through the federal rules of evidence.   As the gatekeeper of evidence, this Court properly, fairly, and legally upheld the federal rules of evidence to ensure the defendant received the fair trial he is constitutionally entitled to receive.   The defendant cannot claim prejudice or receive a new trial based on the interests of justice when this Court followed the federal rules of evidence to ensure the defendant's trial was conducted fairly.

Because this Court did not prevent the defendant from presenting his defense, the interests of justice do not require that the defendant receive a new trial.

6. **Ground Six: The defendant was not entitled to a jury instruction on his theory of the case.**

The interests of justice do not require that the defendant receive a new trial because this Court did not err by not giving the jury an instruction on the defendant's theory of the case.

A district court has broad discretion to determine what instructions to give and in what form.   *See United States v. Orr*, 825 F.2d 1537, 1542 (11th Cir.1987); *United States v. Gaines*, 690 F.2d 849, 856 (11th Cir. 1982).   A jury instruction "must . . . enable the jury to apply the law to the facts."   *United States v. Silverman*, 745 F.2d 1386, 1395-96 (11th Cir. 1984); *see also United States v. Isnadin*, 742 F.3d 1278, 1296 (11th Cir. 2014) ("[T]he charge as a

whole [must] accurately reflect . . . the law in the context of a case's facts"). A district court "has wide latitude in determining the exact formulation of the jury instruction," *United States v. Gaines*, 690 F.2d 849, 856 (11th Cir. 1982), and may "refuse a requested instruction that is incomplete, erroneous, or misleading," *Silverman*, 745 F.2d at 1396; *see also United States v. Rodriguez-Suarez*, 856 F.2d 135, 140 (11th Cir. 1988) ("[T]he judge may refuse confusing or cumulative instructions"); United States v. Lopez, 590 F.3d 1238, 1247-48 (11th Cir. 2009) (while the district court has considerable discretion regarding the extent and character of supplemental jury instructions, it does not have discretion to misstate the law or confuse the jury).

Here, this Court appropriately used its discretion not to instruct the jury on the defendant's proposed instruction. The defendant wanted this Court to instruct the jury:

> Mr. Wade, through his counsel, has introduced evidence to support his theory of the case. Mr. Wade's theory of the case is that someone other than Mr. Wade submitted the EIDL loan applications to the SBA for his businesses without Mr. Wade's approval or consent.

> Mr. Wade has no burden to prove his theory of the case. The government always has the burden of proving Mr. Wade's guilt beyond a reasonable doubt. If there is a reasonable doubt as to the identification of the defendant as the person who submitted the EIDL loan applications, then you must ac-quit.[ ]

Doc. 236 at 20.

The legal substance of this instruction was covered by the instructions this Court gave the jury for the United States' burden and the offense of wire fraud. Doc. 207 at 3; 11-13. The remainder of the defendant's proposed instruction relates to his legal argument. It would have been misleading for this Court to instruct the jury on the defendant's theory of defense, as it would have given greater weight to the defendant's arguments than is legally permissible. The trial court must remain an impartial body of government; it must not emphasize a party's argument or theory of its case. The jury only needed to receive instructions on the elements of the offense, which they did, to apply the facts to the law.

Because this Court did not err by not giving the defendant's proposed jury instruction on his theory of the case, the interests of justice do not require a new trial.

7. **Ground Seven: This Court properly handled the jury's question of fact.**

The interests of justice do not require a new trial when this Court appropriately handled the jury's question of fact.

The due process clause and Sixth Amendment right to jury trial require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of crime with which he is charged beyond reasonable doubt. *See United States v. Gaudin*, 515 U.S. 506, 509-10 (1995). During a

jury trial, the jury must resolve all questions of fact crucial to the issue of guilt or innocence. *See id.* If the jury has a question that calls for the trial court's evaluation of facts or evidence, it will constitute reversible error for a judge to answer such questions. See *United States v. Miller*, 738 F.3d 361, 386 (D.C. Cir. 2013). The trial court has no discretion to evaluate the strength of the evidence, or lack thereof, for the benefit of the jury. *See id.*; *see also United States v. Delgado*, 56 F.3d 1357, 1370 (11th Cir. 1995), cert. denied, 516 U.S. 954 (1995) (holding that a district court did not abuse its discretion in denying a jury's request to read back portions of the trial transcript and instead instructing the jury to rely on its collective recollection).

Here, this Court properly handled a question of fact from the jury. During deliberations, the jury provided a question to this Court asking, "What are the legal requirements to get approved for a grant? Or is there an income requirement." Doc. 209. This is a question concerning the evidence presented at trial, namely, testimony from the SBA witnesses regarding the SBA's requirements in issuing EIDL grants. Two of the wire fraud counts for which the defendant was charged concerned proceeds from EIDL grants. Doc. 1. Knowing what the requirements were to obtain a grant was necessary for the jury to discern whether the defendant engaged in a scheme to defraud the SBA by submitting EIDL grant applications with false

representations.   Because the jury's question was about the evidence presented at trial, this Court instructed the jury that they must rely on its collective recollection of the evidence.   It would have been improper for this Court to instruct the jury on what the evidence showed, as the jury is the finder of fact in a jury trial.

Because this Court properly instructed the jury to rely on its collective recollection of the evidence, the interests of justice do not require a new trial.

**8. Ground Eight: A new trial is not required based on the instruction given to the jury during deliberations.**

The interests of justice do not require a new trial when this Court read the jury an instruction proposed by the defendant.

A defendant is not entitled to a new trial if he invited the error. *See Maradiaga*, 987 F.3d 1322-23.   If a court reads the jury an instruction that the defendant requested, the defendant invited the error. *See id.*

Here, this Court read the instruction the defendant requested.   During the jury's deliberations on September 24, 2024, the jury provided this Court with a question: "We cannot agree on one of the counts.   What is our next step?"   *See* Exhibit 1, page 10 ¶ 12-13.   This Court suggested that the *Allen* charge be read to the jury.   *See id.* at 10 ¶ 14-15.   The defendant, by way of counsel, objected to the charge being read to the jury because "it's too early for

an *Allen* charge. The jury has only been out, you know, at this point, three hours." *See id.* at 10 ¶ 18-20. The defendant then asked for this Court to inquir into whether the jury had reached a verdict on the other counts. *See id.* at 11 ¶ 16-17; 20-21. This Court agreed, and the United States did not object. *See id.* at 11 ¶ 22-24. The defendant's counsel then stated, "Great. And then maybe we could take the next step. But I think if they're just going count by count, it might be premature for an *Allen* charge." *See id.* at 12 ¶ 2-4. This Court proposed a question to the jury, "Are you in agreement on all counts except one? Simple question. Any problem with that?" *See id.* at 12 ¶ 8-9. The defendant's counsel responded, "No, sir." *See id.* at 12 ¶ 11. The jury then provided a response to the question, "We cannot agree on one of the counts. What is our next step?" *See id.* at 14 ¶ 1-2. The defendant again objected to the reading of the *Allen* charge. *See id.* at 14 ¶ 13-14. The following exchange then occurred between the defendant's counsel and this Court:

| | |
|---|---|
| This Court: | Then how would I respond other than to give the *Allen* charge? |
| Defense: | I would just simply ask them to keep trying. If Your Honor disagrees with me, I understand that. |
| This Court: | Well, you can propose -- while they're waiting for me, you can propose an instruction to give |

them that's something other than the *Allen* charge, which tells them to keep trying.

Defense:                Very well.   May I have a moment?

This Court:             Yes. And when you do that, I expect you to argue to me why your proposal is superior to what we've gotten from the Eleventh Circuit.

Defense:                Okay.   Thanks, Judge.

(Recess from 10:02 a.m. to 10:07 a.m.)
(Court called to order.)

Defense:                May I, Your Honor?

This Court:             Yes.

Defense:                So, Your Honor, on the T5 modified *Allen* charge, the defense would ask that in the second paragraph the last two sentences be deleted and the third paragraph be deleted in their entirety.   The reason that we're asking for that –

This Court:             Could I see it?

Defense:                Yes, sir.   The reason that we're asking for that is to avoid the suggestion to this jury that the entire case would have to be tried again as opposed to one count. And we think it would diminish the decision that the jurors have already reached on the counts that they've reached. And it suggests to them that, perhaps, if they failed to reach a verdict, then the entire case would be mistried. So with those alterations, we would propose that the Court give the instruction.

This Court:             Any objection?

| United States: | Your Honor, may I see their modification? I apologize. |
| Defense: | I'm sorry.  I didn't have a chance to talk to the Government before you stepped out. |
| United States: | I don't have an objection, Your Honor. |
| This Court: | Please return the jury. |
| Defense: | Thank you, again, Your Honor. |

*Id.* at 15 ¶ 24 – 17 ¶ 16.

This Court then read to the jury the instruction the defendant, by way of counsel, created and asked for this Court to read.  *See id.* at 17 ¶ 19 – 18 ¶ 23.  If there was an error in the instruction given to the jury, it was invited by the defendant.

The interests of justice do not require that the defendant receive a new trial based on this Court reading an instruction to the jury that was requested by the defendant.

9. **Ground Nine: There are no errors, much less a cumulative effect of errors, that requires a new trial.**

As provided above, the defendant failed to establish that there were errors in this case.  If there are no errors, there can be no cumulative error. *See United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004) (explaining that no cumulative error can exist where the defendant fails to demonstrate individual errors underlying the district court's determination).  Because the

defendant failed to show there were errors in this trial, the defendant cannot show cumulative error. The interests of justice do not require a new trial.

## Conclusion

The interests of justice do not require the defendant receive a new trial. The United States respectfully requests this Honorable Court to deny the defendant's motion for a new trial.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: _____

Hannah Nowalk Watson
Assistant United States Attorney
Florida Bar No. 0123632
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone: (352) 547-3600
Facsimile: (352) 547-3623
E-mail: Hannah.nowalk@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Paul D. Petruzzi, Esq.

Michael J. Petro, Esq.

Corey I. Cohen, Esq.

Diego M. Pestana, Esq.

Lily M. McCarty, Esq.

Richard C. Klugh, Esq.

<u>*s/ Hannah Nowalk Watson*</u>
Hannah Nowalk Watson
Assistant United States Attorney
Florida Bar No. 0123632
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone:   (352) 547-3600
Facsimile:    (352) 547-3623
E-mail: Hannah.nowalk@usdoj.gov

1          **UNITED STATES DISTRICT COURT**
           **MIDDLE DISTRICT OF FLORIDA**
2                  **OCALA DIVISION**

3          **Case No.:  5:22-cr-84-JA-PRL**

4


5     **UNITED STATES OF AMERICA,**

6          Plaintiff,                    Orlando, Florida
                                         September 24, 2024
7              v.                        8:57 a.m. - 2:09 p.m.

8     **HENRY TROY WADE,**

9          Defendant.
      _____/
10


11


12         **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
           **BEFORE THE HONORABLE JOHN ANTOON II**
             **UNITED STATES DISTRICT JUDGE**

13


14


15


16    **Court Reporter:**      Nikki L. Peters, RMR, CRR, CRC
                               Federal Official Court Reporter
17                             401 West Central Boulevard, Suite 4600
                               Orlando, Florida  32801
18                             courttranscripts@outlook.com

19


20


21


22


23


24         Proceedings recorded by mechanical stenography.
           Transcript produced by computer-aided transcription.
25

EXHIBIT
1

1    **APPEARANCES:**

2    **Counsel for the Government:**

3           Hannah Nowalk
           United States Attorney's Office
4         35 SE 1st Avenue, Suite 300
           Ocala, Florida  34471

5

6    **Counsel for Defendant:**

7           Paul Petruzzi
           Law Offices of Paul D. Petruzzi, P.A.
8         8101 Biscayne Boulevard, PH 701
           Miami, Florida  33138

9

           Lily M. McCarty
10        Todd Foster Law Group
           601 Bayshore Boulevard
11        Tampa, Florida 33606

12         Corey Cohen
           The Law Office of Corey Cohen
13         21 Park Lake Street
           Orlando, Florida  32803
14

           Diego M. Pestana
15         The Suarez Law Firm, P.A.
           1011 West Cleveland Street
16         Tampa, Florida  33606

17

18

19

20

21

22

23

24

25

1                        **INDEX OF PROCEEDINGS**

2                                                              **PAGE**

3       Question from the Jury                               4

4       Allen Charge                                         17

5       Verdict                                              20

6       Polling of the Jury                                  21

7       Forfeiture Proceedings                               28

8       Argument by Ms. Nowalk                               31

9       Argument by Mr. Petruzzi                             31

10      Argument on Renewed Rule 29 Motion by Mr. Pestana    34

11      Special Verdict Regarding Forfeiture                 37

12      Rule 29 Continuing Argument By Mr. Pestana           38

13      Response by Ms. Nowalk                               54

14      Rebuttal Argument by Mr. Pestana                     61

15      Ruling by the Court                                  67

16      Certificate of Reporter                              70

17

18                      **E X H I B I T S**

                                                             **PAGE**
19      Court Exhibit Number 1                               5

20

21

22

23

24

25

1      **P R O C E E D I N G S**

2          (Court called to order at 8:57 a.m.)

3          **THE COURT:**  I got this question from the jury:

4          What are the legal requirements to get approved for a

5      grant or is there an income requirement?

6          My proposed response is:  You must rely upon the

7      evidence presented and the Court's instructions to you on the

8      law.

9          Is there any objection to that?

10          **MS. NOWALK:**  No objection.

11          **MS. McCARTY:**  No, Your Honor.

12          **THE COURT:**  Please return the jury.

13          I should note that Counsel are present and the

14      defendant is present.

15          (Jury entered the courtroom at 8:57 a.m.)

16          **THE COURT:**  Please be seated.

17          I received this unsigned note from the jury:

18          What are the legal requirements to get approved for a

19      grant or is there an income requirement?

20          My response to your question is:

21          You must rely on the evidence that's been presented

22      during the course of the trial and the Court's instructions to

23      you on the law.

24          Thank you.

25          (Jury exited the courtroom at 8:58 a.m.)

1          **THE COURT:**  Mr. Pestana, during the course of

2     argument, you wanted to -- the way you put it is you wanted to

3     make a record regarding the question of whether the

4     Government's argument constituted a variance.  I've, since you

5     made that, looked at the law.  I will give you an opportunity

6     to submit something on it.  But I've looked at the law, and I'm

7     satisfied that I -- there is authority for what I said.

8          I'll be glad to look at anything you might have.

9          **MR. PESTANA:**  Understood, Your Honor.  By that, do

10    you mean a written submission or oral argument now or --

11         **THE COURT:**  You can either write something out or

12    just give me the case law.

13         **MR. PESTANA:**  Okay.  Your Honor, give me one moment,

14    and I'll have that for you.

15         **MR. PETRUZZI:**  If we could have a copy of the jury

16    note at the Court's convenience.

17         **THE COURT:**  It's part of the court record.

18         **MR. PETRUZZI:**  Okay.  Very well.

19         **THE COURT:**  I make it a court exhibit.  It's Court

20    Exhibit 1, I think.

21         (Court Exhibit Number 1 received in evidence.)

22         **MR. PETRUZZI:**  Thank you, Your Honor.

23         **THE COURT:**  You can have a copy, though.  I've got a

24    copy right here.  It's very legible.

25         **MR. PETRUZZI:**  Thank you.

1    **MR. PESTANA:** Your Honor, the case that we would cite

2    for support -- and I have a copy, if Your Honor would like --

3    it's *United States v. Madden*, 733 F.3d 1314. That's an

4    Eleventh Circuit decision from 2013.

5          I'll read the pertinent part here.

6    **THE COURT:** Just give it to me, and I'll look at it.

7    **MR. PESTANA:** Okay. And the argument here, Your

8    Honor, as it applies here, Your Honor, is that the indictment

9    was constructively amended because it allows -- Ms. Nowalk's

10   argument allowed and broadened the possible basis for

11   conviction beyond what was contained in the indictment.

12   Namely, there is nothing in the indictment that allows a

13   conviction beyond the defendant acting alone. When she brought

14   in to possibly working with others, she brought in the basis

15   for possible convictions --

16   **THE COURT:** I understand, Mr. Pestana.

17          Thank you.

18       (Court was at ease.)

19   **THE COURT:** I'll remember to bring in cases more on

20   point, although not from the Eleventh Circuit or even the

21   circuit court. They're trial court opinions, but they deal

22   specifically with this, so give a brief explanation.

23          Your motion was, what, to strike?

24   **MR. PESTANA:** It was to make the record in support of

25   Ms. McCarty's objection during the closing argument.

1          **MR. PETRUZZI:**  Yes, Your Honor.

2          **THE COURT:**  Just in support of her --

3          **MR. PESTANA:**  Yes, Your Honor.

4          **THE COURT:**  -- position on that?  Okay.

5       (Recess from 9:04 a.m. to 9:15 a.m.)

6          **THE COURT:**  Your argument on this variance is

7    puzzling to me.  As I mentioned before, the defense was

8    pointing at these other -- various other people throughout.

9    But even aside from that, there is an Eleventh Circuit case,

10   *Bourtzakis* -- B-O-U-T -- B-O-U-R-T-Z-A-K-I-S -- *v. U.S.*

11   *Attorney General*, 940 F.3d 616, saying that aiding and abetting

12   is an alternative charge in every federal indictment whether

13   explicit or implicit.  And the rule is well established, both

14   in this circuit and others, the one has been indicted is a

15   principal and may be convicted on evidence showing that he

16   merely aided and abetted.

17          There are a couple other cases, *United States v.*

18   *Kahre*, K-A-H-R-E.  It's not a reported case.  It's 2009 Westlaw

19   10715473.  Defendant Kahre contends the Government ambushed and

20   blindside -- blindsided, sic -- blindsided her by waiting until

21   the rebuttal closing argument to argue that she could be guilty

22   of wire fraud by aiding and abetting in wire fraud.  She

23   asserts that the Government, therefore, affirmatively misled

24   her to prepare a defense that would not be sufficient to ward

25   off the aider-and-abettor theory.  This Court disagrees.  In

1     the first instance, aiding and abetting is implied in every

2     federal indictment for a substantive offense.

3              So I think it was a motion to strike.  Whatever the

4     motion was on a variance is denied.

5              Is there -- there's an attorney lounge here, right?

6          **MS. McCARTY:**  There is on the fourth floor,

7     Your Honor.  Yes, there is one down on the fourth floor, all

8     the way at the end.

9          **THE COURT:**  Does it have any amenities?  Does it have

10    coffee or --

11         **MS. McCARTY:**  It's funny because last week -- the

12    person who's the president of the Federal Bar Association, the

13    attorney, was in there on zoom.  And he said they were failing

14    because it was supposed to be stocked with water and coffee,

15    and none of those things were in there.  So they were going to

16    make sure it was corrected in the future.

17         **MR. COHEN:**  There's not even coffee cups.  There used

18    to be K pods, those little pods.  There used to be a bunch of

19    stuff, and there was nothing, so ...

20             But we're hanging out right here, if the Court is

21    okay with it.  It's easier for us to come back and forth if

22    there's a question.

23         **THE COURT:**  I attend the almost monthly FBA meetings

24    when I can, and I will bring that up because I know at one time

25    they were happy to have done that.  It was one of the things

1    that they -- one of their accomplishments.  But apparently it's

2    been neglected.

3           **MS. McCARTY:**  It was nice to have.  It was very

4    accommodating.  So, regardless, it was -- we can go there and

5    not have to worry about being loud in the hallways or anything.

6           **THE COURT:**  Okay.

7           (Recess from 9:21 a.m. to 9:50 a.m.)

8           (Court called to order.)

9           **THE COURT:**  Mr. Pestana, as you know, as you well

10    know, we are lucky in the federal court to get the best and

11    brightest people helping us.  They help us even as we are

12    working in here, as you know.

13           In addition to the cases I gave you, I do have an

14    Eleventh Circuit case.  Again, it's unpublished, but it's more

15    on point.  I give credit to my brilliant law clerk for finding

16    it.  It has to do with a -- not like the other one that dealt

17    with a late argument, this one had to do with the judge

18    including an amended -- including aiding and abetting when it

19    wasn't charged in the indictment.  And what it says is:

20    "Former" -- and this is *U.S. v. Thomas*, 631 F.App'x 847.  The

21    former Fifth Circuit has held where an indictment failed

22    expressly to charge a defendant with aiding and abetting, the

23    district court did not error in giving an aiding and abetting

24    instruction since aiding and abetting is, quote, an alternative

25    charge in every count whether explicit or implicit and one who

1   has been indicted as a principal may be convicted on evidence

2   showing that he merely aided and abetted the commission of the

3   offense.

4           And significantly, this case had to do with a defense

5   that somebody else committed the crime.  And it had to do with

6   fraud and a bank account.  So I give you credit that you did

7   not initially make that objection, and you followed it up with

8   argument without much preparation, but I don't think it's a

9   good argument.

10          Now, on to more important business -- or at least

11  more immediate business, I have another question from the jury.

12          This question is:  We cannot agree on one of the

13  counts.  What is our next step?

14          My suggestion is that we provide them with the Allen

15  charge that's been modified.

16          Any objection from the Government?

17          **MS. NOWALK:**  No objection.

18          **MR. PETRUZZI:**  Yes, Your Honor.  I think it's too

19  early for an Allen charge.  The jury has only been out, you

20  know, at this point, three hours.

21          **THE COURT:**  Well --

22          **MR. PETRUZZI:**  It seems to me, Your Honor, if I

23  may -- and I'm sorry.  I didn't mean to speak over you.

24          It seems to me from their first question, since the

25  first count is a grant, that the jury may be --

1          **THE COURT:**  The first count is what?

2          **MR. PETRUZZI:**  The first count of the indictment is a

3   grant.  So the jury's first question dealt with a grant.

4          It seems to me that the jury is just simply going

5   count by count.  And so I would just --

6          **THE COURT:**  No, it says "we cannot agree on one of

7   the counts.

8          **MR. PETRUZZI:**  Right.

9          **THE COURT:**  So --

10         **MR. PETRUZZI:**  That's consistent with them proceeding

11  count by count.  So -- and it's also consistent with them --

12         **THE COURT:**  So what is your suggestion, that I do

13  nothing, that I just ignore their question?

14         **MR. PETRUZZI:**  Ask them to keep deliberating.

15         **THE COURT:**  No, I'm not going to do that.

16         **MR. PETRUZZI:**  If they say that they're deadlocked

17  completely --

18         **THE COURT:**  Well, I can ask them if they're

19  deadlocked completely.

20         **MR. PETRUZZI:**  If they've reached a verdict on all of

21  the other counts.

22         **THE COURT:**  I can ask them that.  If I get agreement

23  of counsel, I think I can ask them that.

24         **MS. NOWALK:**  No objection.

25         **THE COURT:**  And I'll do that in writing.  I'll just

1   send them a note.

2           **MR. PETRUZZI:**  Great.  And then maybe we could take

3   the next step.  But I think if they're just going count by

4   count, it might be premature for an Allen charge.

5           **THE COURT:**  Are these your notes, Keitra?  I don't

6   want to take your notes.

7           **THE COURTROOM DEPUTY:**  No, they're not, Your Honor.

8           **THE COURT:**  Are you in agreement on all counts except

9   one?  Simple question.  Any problem with that?

10          **MS. NOWALK:**  No objection.

11          **MR. PETRUZZI:**  No, sir.

12          **MS. McCARTY:**  Your Honor, I guess I should say:  Are

13  you in agreement on all counts except for one count?  Not,

14  like, number one, if that makes sense.

15          **THE COURT:**  Well, I don't think that's a --

16          **MS. McCARTY:**  Okay.

17          **THE COURT:**  -- fair reading but I'll redo it, if

18  you --

19          **MR. PETRUZZI:**  No.  I think it's fine, Your Honor.

20          **THE COURT:**  Okay.

21          **THE COURTROOM DEPUTY:**  Make a copy?

22          **THE COURT:**  Yes, you should make a copy of that.

23          Oh, no, you don't need to make a copy of it.  I read

24  it into the record.

25          **THE COURTROOM DEPUTY:**  Okay.

1          **MR. PETRUZZI:**  I'd ask that it be made a copy of the

2     record, of course, Your Honor, at some point.

3          **THE COURT:**  Why?

4          **MR. PETRUZZI:**  Sorry, Your Honor?

5          **THE COURT:**  Why?

6          **MR. PETRUZZI:**  Just because it's a jury

7     communication.  It doesn't have to be done right this second,

8     just whenever it's convenient for the Court.

9          **THE COURT:**  But I read it into the record.  So I'm

10    asking why does it need to be -- why do you want it in writing?

11         **MR. PETRUZZI:**  I just think it's an exhibit for the

12    jury.  It's pretty much standard.

13         **THE COURT:**  Ms. Davis, will you make a copy of that?

14         **THE COURTROOM DEPUTY:**  Now, Judge?

15    Now?

16         **THE COURT:**  Yes.

17         **MR. PETRUZZI:**  Thank you, Your Honor.

18         **THE COURT:**  Otherwise, I have to retrieve it.

19         In the meantime, you-all can look at the proposed

20    Allen instruction.  I think it's the 2024 version.

21         **MR. PETRUZZI:**  Pattern, Your Honor?

22         **THE COURT:**  Yes.

23         **MR. PETRUZZI:**  Thank you.

24         **MS. McCARTY:**  Your Honor, can I ask you to reread the

25    jury question one more time?

1          **THE COURT:**  We cannot agree on one of the counts.

2    What is our next step?

3          Now, this should be a part of the record.  I don't

4    think the question itself needs to be.  But let me substitute

5    this for that.  They've sent me the answer back.

6          **MR. PETRUZZI:**  Okay.

7          **THE COURT:**  So it's got my question and the answer.

8    The answer is yes.

9          Funny.  The first one came from Ms. Heard.  This came

10   from Mr. Dodson.  So I don't know who the foreperson is.

11         So do you agree that I give them the Allen charge?

12         **MS. NOWALK:**  Yes, Your Honor.

13         **MR. PETRUZZI:**  For record purposes, I'll preserve an

14   objection to it, Your Honor.

15         **THE COURT:**  What is the objection?  What do you want

16   me to do?

17         **MR. PETRUZZI:**  I just think it's coercive, and it's

18   only been three hours, Your Honor.  Ask them to keep trying.

19         **THE COURT:**  Well, that's what I do with the Allen

20   charge.

21         **MR. PETRUZZI:**  I understand, Your Honor.  I

22   understand the Court's position.  I'm just making --

23         **THE COURT:**  But I want to understand yours, and I

24   don't understand it.  They've asked me, what is the next step?

25   Pursuant to request, I asked them if they were deadlocked on

1     one count.  And the answer is yes.

2          **MR. PETRUZZI:**  Yes, sir.

3          **THE COURT:**  So what do you propose I do now, just go

4     to lunch?

5          **MR. PETRUZZI:**  No.  No, it's too early for that,

6     Your Honor.  It's only 10:00 a.m.

7          **THE COURT:**  Well, what, just go back and just ignore

8     it?

9          **MR. PETRUZZI:**  No, sir.  I'm not saying that.

10         **THE COURT:**  Well, I don't want you preserving things

11    for the record unless there's a basis for it, and I'm trying to

12    figure out what the basis is.

13         **MR. PETRUZZI:**  The basis is that I think that if they

14    spent a little more time on whatever count they're charged

15    with -- or they're hung up on, rather, they may be able to come

16    to a decision on their own.

17         **THE COURT:**  Don't you think at this point they're

18    waiting for an answer from me as to what they're supposed to

19    do?

20         **MR. PETRUZZI:**  Yes, sir.

21         **THE COURT:**  So you still think I should ignore the --

22    their expected response?

23         **MR. PETRUZZI:**  Not at all, Your Honor.  I don't --

24         **THE COURT:**  Then how would I respond other than to

25    give the Allen charge?

1          **MR. PETRUZZI:**  I would just simply ask them to keep

2     trying.

3               If Your Honor disagrees with me, I understand that.

4          **THE COURT:**  Well, you can propose -- while they're

5     waiting for me, you can propose an instruction to give them

6     that's something other than the Allen charge, which tells them

7     to keep trying.

8          **MR. PETRUZZI:**  Very well.

9               May I have a moment?

10         **THE COURT:**  Yes.  And when you do that, I expect you

11    to argue to me why your proposal is superior to what we've

12    gotten from the Eleventh Circuit.

13         **MR. PETRUZZI:**  Okay.

14              Thanks, Judge.

15         (Recess from 10:02 a.m. to 10:07 a.m.)

16         (Court called to order.)

17         **MR. PETRUZZI:**  May I, Your Honor?

18         **THE COURT:**  Yes.

19         **MR. PETRUZZI:**  So, Your Honor, on the T5 modified

20    Allen charge, the defense would ask that in the second

21    paragraph the last two sentences be deleted and the third

22    paragraph be deleted in their entirety.

23              The reason that we're asking for that --

24         **THE COURT:**  Could I see it?

25         **MR. PETRUZZI:**  Yes, sir.

1          The reason that we're asking for that is to avoid the

2     suggestion to this jury that the entire case would have to be

3     tried again as opposed to one count.  And we think it would

4     diminish the decision that the jurors have already reached on

5     the counts that they've reached.  And it suggests to them that,

6     perhaps, if they failed to reach a verdict, then the entire

7     case would be mistried.  So with those alterations, we would

8     propose that the Court give the instruction.

9          **THE COURT:**  Any objection?

10         **MS. NOWALK:**  Your Honor, may I see their

11    modification?  I apologize.

12         **MR. PETRUZZI:**  I'm sorry.  I didn't have a chance to

13    talk to the Government before you stepped out.

14         **MS. NOWALK:**  I don't have an objection, Your Honor.

15         **THE COURT:**  Please return the jury.

16         **MR. PETRUZZI:**  Thank you, again, Your Honor.

17         **THE COURT:**  I'll send a note back with them, Keitra.

18    (Jury entered the courtroom at 10:09 a.m.)

19         **THE COURT:**  Please be seated.

20         I received your last note.

21         I'm going to ask that you continue your deliberations

22    in an effort to agree on a verdict and dispose of this case.

23    And I have a few additional comments I'll make for you to

24    consider as you do so.

25         This is an important case.  The trial has been

expensive in time, effort, money, and emotional strain on both
the defense and the prosecution.  If a substantial majority of
you are in favor of a conviction, those of you who disagree
should reconsider whether your doubt is a reasonable one since
it appears to make no effective impression upon the minds of
the others.

On the other hand, if a majority or even a small
number of you are in favor of an acquittal, the rest of you
should ask yourselves again, and most thoughtfully, whether you
should accept the weight and sufficiency of the evidence that
fails to convince your fellow jurors beyond a reasonable doubt.

Remember at all times that no juror is expected to
give up an honest belief about the weight and effect of the
evidence.  But after fully considering the evidence in the
case, you must agree on a verdict, if you can.

You must also remember that if the evidence fails to
establish guilt beyond a reasonable doubt, the defendant must
have the unanimous verdict of not guilty.

You should not be hurried in your deliberations, and
you should take all the time you feel is necessary.  I now ask
that you retire once again and continue your deliberations with
these additional comments in mind.  Apply them in conjunction
with all the other instructions I've previously given you.

And if you'll wait just one moment, I'm going to send
the note back with you -- well, I'll just ask you to send me a

1    note.  Let me know one way or the other whether you want me to

2    order lunch for you.

3              **JUROR:**  We do like food.

4         (Recess from 10:12 a.m. to 10:16 a.m.)

5              **THE COURT:**  Any objection to this note going to the

6    jury:

7              Members of the jury, would you like me to order lunch

8    for you?  It will take more than an hour to arrive.

9              **MS. NOWALK:**  No objection.

10             **MR. PETRUZZI:**  No objection.

11        (Court was at ease.)

12             **THE COURT:**  They have a verdict.

13             Please return the jury.

14        (Jury entered the courtroom at 10:18 a.m.)

15             **THE COURT:**  Ms. Heard, has the jury selected a

16   foreperson?

17             **JUROR NUMBER 12:**  Yes, sir.

18             **THE COURT:**  Are you the foreperson?

19             **JUROR NUMBER 12:**  Yes, sir.

20             **THE COURT:**  Has the jury reached a verdict?

21             **JUROR NUMBER 12:**  Yes, sir.

22             **THE COURT:**  Would you deliver the verdict form to

23   Mr. Downey, please.

24             Ms. Heard, would you date the verdict, please.

25             **JUROR NUMBER 12:**  I actually didn't have my watch,

1   and I wasn't sure if it was the 24th.  Sorry.  Is it the 24th?

2   Apologies.

3           **THE COURT:**  It is the 24th, isn't it?

4           **THE COURTROOM DEPUTY:**  Yes.

5           **THE COURT:**  My computer says the 23rd.  This one says

6   the 23rd; this one says the 24th.

7           **JUROR NUMBER 12:**  I feel better now.

8           **THE COURT:**  Madam Clerk, would you publish the

9   verdict, please.

10           **THE COURTROOM DEPUTY:**  Yes, sir.

11        In the matter of the United States of

12   America v. Henry Troy Wade, Case No. 5:22-cr-84, the verdict is

13   as follows:

14        Count 1 of the indictment.

15        As to the offense of wire fraud, in violation of

16   18 United States Code, Section 1343, relating to the May 1st,

17   2020, transaction, as charged in Count 1 of the indictment, we,

18   the jury, find the defendant, Henry Troy Wade, guilty.

19        Count 2 of the indictment.

20        As to the offense of wire fraud, in violation of 18

21   United States Code, Section 1343, relating to the June 30th,

22   2020, transaction, as charged in Count 2 of the indictment, we,

23   the jury, find the defendant, Henry Troy Wade, guilty.

24        Count 3 of the indictment.

25        As to the offense of wire fraud, in violation of

1    18 United States Code, Section 1343, related to the July 7th,

2    2020, transaction, as charged in Count 3 of the indictment, we,

3    the jury, find the defendant, Henry Troy Wade, guilty.

4              Count 4 of the indictment.

5              As to the offense of wire fraud, in violation of

6    18 United States Code, Section 1343, relating to the

7    August 3rd, 2020, transaction, as charged in Count 4 of the

8    indictment, we, the jury, find the defendant, Henry Troy Wade,

9    guilty.

10             Count 5 of the indictment.

11             As to the offense of wire fraud, in violation of

12   18 United States Code, Section 1343, relating to the

13   August 4th, 2020, transaction, as charged in Count 5 of the

14   indictment, we, the jury, find the defendant, Henry Troy Wade,

15   guilty.

16             Count 6 of the indictment.

17             As to the offense of wire fraud, in violation of 18

18   United States Code, Section 1343, relating to the March 31st,

19   2021, transaction, as charged in Count 6 of the indictment, we,

20   the jury, find the defendant, Henry Troy Wade, guilty.

21             So say we all.  This 24th day of September, 2024,

22   signed by the foreperson.

23             **THE COURT:**  Madam Clerk, would you poll the jury?

24             **THE COURTROOM DEPUTY:**  Yes, sir.

25             Juror Number 1, is this your true verdict?

1           **JUROR NUMBER 1:**  Yes.

2           **THE COURTROOM DEPUTY:**  Juror Number 2, is this your

3    true verdict?

4           **JUROR NUMBER 2:**  Yes.

5           **THE COURTROOM DEPUTY:**  Juror Number 3, is this your

6    true verdict?

7           **JUROR NUMBER 3:**  Yes.

8           **THE COURTROOM DEPUTY:**  Juror Number 4, is this your

9    true verdict?

10          **JUROR NUMBER 4:**  Yes.

11          **THE COURTROOM DEPUTY:**  Juror Number 5, is this your

12   true verdict?

13          **JUROR NUMBER 5:**  Yes.

14          **THE COURTROOM DEPUTY:**  Juror Number 6, is this your

15   true verdict?

16          **JUROR NUMBER 6:**  Yes.

17          **THE COURTROOM DEPUTY:**  Juror Number 7, is this your

18   true verdict?

19          **JUROR NUMBER 7:**  Yes.

20          **THE COURTROOM DEPUTY:**  Juror Number 8, is this your

21   true verdict?

22          **JUROR NUMBER 8:**  Yes.

23          **THE COURTROOM DEPUTY:**  Juror Number 9, is this your

24   true verdict?

25          **JUROR NUMBER 9:**  Yes.

1          **THE COURTROOM DEPUTY:**  And Juror Number 10, is this

2     your true verdict?

3          **JUROR NUMBER 10:**  Yes.

4          **THE COURTROOM DEPUTY:**  Juror Number 11, is this your

5     true verdict?

6          **JUROR NUMBER 11:**  Yes.

7          **THE COURTROOM DEPUTY:**  And Juror Number 12, is this

8     your true verdict?

9          **JUROR NUMBER 12:**  Yes.

10          **THE COURTROOM DEPUTY:**  Thank you.

11          **THE COURT:**  Ladies and gentlemen, I want to thank you

12     for the time and consideration you gave this case and advise

13     you of certain privileges that you enjoy having done so.

14          No one can ever require that you talk about what

15     happened in your deliberations.  For centuries, our society has

16     recognized the importance of the jury's work and the importance

17     of it remaining private as long as they wish.  Therefore, the

18     law gives you the unique privilege not to speak about the

19     jury's work.

20          Now, I don't think anyone is going to question you.

21     I have no reason to think that that's going to be the case.

22     But you are at liberty to refuse to speak to anyone.  If

23     somebody does approach you, it may be to find fault with you.

24     It may be to -- that they're just curious.  But it will be up

25     to you to decide whether you exercise your privilege not to

1    talk about the case.

2            And if you don't mind, please return to the jury

3    room, and I'll be with you in a couple minutes.

4            There's another matter that you need to -- that we're

5    going to take up.  It shouldn't take too long.  I won't be with

6    you because of that other matter.

7            So if you'll go back, I'll be with you momentarily.

8        (Jury exited the courtroom at 10:24 a.m.)

9            **THE COURT:**  You looked at the forfeiture instruction,

10   right?

11           **MR. PETRUZZI:**  Yes, sir.

12           **THE COURT:**  Okay.  You can go ahead and put those on

13   the chair for the -- let me see that.

14           Okay.  Please return the jury.

15           Are you going to present evidence, Ms. Nowalk?

16           **MS. NOWALK:**  No, Your Honor.  We will just be relying

17   on the two exhibits that were introduced relating to

18   forfeiture.  That would be Exhibit 5, the Big Valley

19   Grille & Bistro loan application, and Exhibit 16, which is the

20   MidFlorida Credit Union account ending in --

21           **THE COURT:**  I tell them that they will consider

22   evidence.  You can just say that you're relying on that.

23           **MS. NOWALK:**  Yes, Your Honor.

24           **THE COURT:**  Are you going to put on any evidence?

25           **MS. McCARTY:**  Yes, Your Honor.  If I could have a

1    moment?  I'm just trying to ...

2         **MR. PETRUZZI:**  Yes, Your Honor.  We'll be putting on

3    evidence, unless the Government wants to stipulate with respect

4    to the check that was issued to the Secret Service by

5    MidFlorida bank.

6         **MS. McCARTY:**  The Big Valley, the 149.

7         **MR. PETRUZZI:**  Count 6.

8         **MS. NOWALK:**  That's the seizure.  That's what we're

9    talking about.

10        **MR. PETRUZZI:**  It was forfeited.  Secret Service

11   already has the money.  Wade doesn't have the money anymore.

12        **MS. NOWALK:**  Right.  So I think if we can talk,

13   Your Honor.

14        **THE COURT:**  Okay.

15        **MS. NOWALK:**  I think there might be a point of

16   confusion.

17        **MR. PETRUZZI:**  No, there's no confusion, Your Honor.

18   There was a civil forfeiture that's already taken place, and

19   the check was already negotiated.  So ...

20        **MS. NOWALK:**  Your Honor, if I may discuss this with

21   our asset forfeiture team?

22        **THE COURT:**  Yes.

23        **MS. NOWALK:**  Okay.

24        **MR. PETRUZZI:**  I'm ready to go, Your Honor, and the

25   jury is here.

1          Frankly, Your Honor, I think there was testimony in

2     the record already.  So ...

3          (Court was at ease.)

4          **MS. NOWALK:**  Your Honor, just in conferring with

5     Special Agent Rosado, our memory -- but I would like to confer

6     with Jen Harrington, our asset forfeiture attorney -- but our

7     memory is that we were seeking a civil forfeiture in this case,

8     but at the point in which we decided to criminally indict the

9     defendant, we no longer pursued the civil forfeiture.  So while

10    we may have the money, it still needs to be forfeited for,

11    like, legal purposes of forfeiture.  We may physically have it

12    in our possession, but it's not forfeited yet by the defense.

13         **MR. PETRUZZI:**  So I don't believe that that's

14    correct, Your Honor.  I think that the Secret Service has

15    already negotiated that check and Secret Service already has

16    that money.  And Mr. Wade --

17         **THE COURT:**  Let's see if we can find that out.

18         **MS. NOWALK:**  Yes, Your Honor.

19         Tell the jury I'll be with them momentarily, but

20    relax.

21         (Recess from 10:29 a.m. to 10:46 a.m.)

22         **MS. NOWALK:**  Yes, Your Honor.

23         So I spoke with Jenn Harrington, and Special Agent

24    Rosado spoke with asset forfeiture people.  What's going on is

25    that the defendant gave a check to the Secret Service that

1    they're holding, waiting to see if there's a judgment for them

2    to give that check to the marshals, the U.S. Marshals in

3    forfeiture, or give it back to the defendant.  And --

4           **MR. PETRUZZI:**  And so --

5           **MS. NOWALK:**  So the question now for the jury is that

6    they found the defendant guilty of Count 6 and they should only

7    be instructed to decide whether or not they think that the

8    proceeds of the criminal offense are the $149 [sic].  But I

9    fear --

10          **THE COURT:**  $149,000.

11          **MS. NOWALK:**  Yes, Your Honor.  I apologize, thousand

12   dollars.

13          But I fear that there might be testimony confusing

14   the jury regarding the ownership and how the Secret Service is

15   holding possession of it, and I do not think that's a proper

16   argument.

17          **MR. PETRUZZI:**  May I respond?

18          **THE COURT:**  Yes.

19          **MR. PETRUZZI:**  Thank you, sir.

20          So there's a few things to unpack here.  And I am not

21   going to address what the Government is suggesting.  That is

22   something that's going to have to be determined at sentencing,

23   i.e. whether forfeiture and restitution should be independently

24   imposed in this particular case.

25          Our position at that time will obviously be that

1    forfeiture of these proceeds to the extent that they're used to

2    make the SBA whole should substitute for restitution or vice

3    versa.  But for present purposes, our argument is going to be

4    that this particular loan was not connected to the defendant

5    because it was applied for, in our view, by someone else who

6    was using his identification.

7           If the jury decides otherwise, then that's fine.

8    We've preserved our other evidentiary issues at trial with

9    respect to sufficiency of the evidence on Count 6.

10          **THE COURT:**  How long do you think it will take you to

11   do that?

12          **MR. PETRUZZI:**  Ten minutes, 15 minutes, give or take,

13   at least from my side.

14          **THE COURT:**  Okay.  Well, you're not going to do much,

15   are you?

16          **MS. NOWALK:**  No, Your Honor.

17          **THE COURT:**  Please return the jury.

18          **MS. NOWALK:**  Your Honor, may I approach the clerk to

19   retrieve one exhibit?

20          **THE COURT:**  Yes.

21       (Jury entered the courtroom at 10:49 a.m.)

22          **THE COURT:**  Members of the jury, your verdict in this

23   case does not complete your jury service as it would in most

24   cases because there's another matter that you must now

25   consider.

1        You must decide whether the defendant, Henry Troy

2   Wade, should forfeit certain property to the United States as a

3   part of the penalty for the crime charged in Count 6 of the

4   indictment.  And a portion of the indictment not previously

5   discussed or disclosed to you -- well, it actually, I think,

6   was part of the indictment that was delivered to you.  It's

7   alleged that the defendant obtained certain property from

8   committing the offense charged in Count 6.

9        In view of your verdict finding the defendant guilty

10  of that offense, you must also decide whether the property

11  should be forfeited to the United States.

12       To forfeit a thing is to be divested or deprived of

13  the ownership of it as a part of the punishment allowed by law

14  for certain criminal offenses.

15       To decide whether a property should be forfeited, you

16  should consider all the evidence that you've already heard,

17  plus any additional evidence that will be presented to you

18  after these instructions.

19       A copy of the forfeiture allegations in the

20  indictment will be given to you to consider during your

21  supplemental deliberations.  They describe the property

22  allegedly subject to forfeiture to the United States as

23  approximately $149,100 seized from MidFlorida Credit Union

24  account number 129948001, held in the name of Big Valley

25  Grille & Bistro LLC.

1    To be entitled to the forfeiture of this property,

2    the Government must prove by a preponderance of the evidence

3    that this property is, was derived from, or is traceable to the

4    proceeds the defendant obtained directly or indirectly as a

5    result of the crime charged in Count 6 of the indictment.

6    By a preponderance of the evidence simply means an

7    amount of evidence that's enough to persuade you that a claim

8    or contention is more likely true than not.

9    To be derived from something means that the property

10   under consideration must have been formed or developed out of

11   the original source so as to be directly descended from that

12   source.

13   To be traceable to something means that the property

14   under consideration must have followed an ascertainable course

15   or trail in successive stages of development or progress from

16   the original source.

17   While deliberating about the issue of forfeiture, you

18   must not reexamine your previous determination regarding the

19   defendant's guilt.  But all the instructions previously given

20   to you concerning your consideration of the evidence, the

21   credibility of witnesses, your duty to deliberate together, and

22   your duty to base your verdict solely on the evidence without

23   prejudice, bias, or sympathy and the necessity of a unanimous

24   verdict will continue to apply during these supplemental

25   deliberations.

1          And I will give you each a copy of the -- of this

2    instruction.

3          Ms. Nowalk.

4          **MS. NOWALK:**  Yes, Your Honor.  Just argument.

5          **THE COURT:**  I'm sorry, Ms. Nowalk.

6          I will also give you a special verdict regarding

7    forfeiture.  It will just have a place for to you mark yes or

8    no signed by the foreperson.

9          **MS. NOWALK:**  Members of the jury, so at this stage of

10   the trial, as the judge instructed you, you have already found

11   the defendant is guilty of Count VI.  Count 6 is the count

12   regarding Big Valley Grille & Bistro.  So the only decision

13   that you have now is whether the proceeds of the criminal act

14   in Count 6 are $149,100.

15         So that would be with the wire transaction that

16   entered that bank account for Big Valley Grille & Bistro ending

17   in 8001, which I believe is Exhibit 16 that you have back

18   there.

19         So you just have to look at that to see if those are

20   the proceeds of the offense.

21         **MR. PETRUZZI:**  Good morning, ladies and gentlemen.

22         Thank you for your verdict, and thank you for your

23   service.  We understand that it hasn't been easy for anyone.

24         So the judge is going to instruct you, as he already

25   has, with respect to forfeiture of the $149,100 that was seized

1    already from the MidFlorida Credit Union.  There was testimony

2    in this case that those funds have already been provided to the

3    Secret Service.  So I would like you to look at the special

4    jury charge with respect to forfeiture.

5         In particular, the term "forfeited" means for someone

6    to be divested or deprived of the ownership of something as

7    part of punishment allowed by law.

8         So in this sense, things are a little different than

9    a normal trial.  You're essentially adding on what is in the

10   forfeiture count in the special jury charge described as a

11   punishment.

12        **MS. NOWALK:**  Objection.  Improper argument.

13        **THE COURT:**  Sustained.

14        **MR. PETRUZZI:**  The punishment is allowed by law, as

15   instructed by the Court, and is simply set forth in the

16   forfeiture allegations.

17        We would ask that you consider a few things with

18   respect to this count.

19        First, there is no evidence in the record that

20   Mr. Wade has made any claim to this.

21        We would ask you to consider whether the evidence was

22   sufficient that Mr. Wade himself got this money or who got the

23   money and whether there was any nexus between that money and

24   Mr. Wade's crime.  And we'd ask that you remember back to that

25   application that was filed with respect to this $149,100.  That

1    application contained a driver's license.  And we've all seen

2    it.  It's one of perhaps three different driver's licenses that

3    were included in this case as evidence.  We'd ask that you

4    consider those driver's licenses and question whether it was

5    Mr. Wade who actually wanted this money or whether it was

6    somebody else.

7          We'd ask that you do that in rendering this

8    additional verdict with respect to the forfeiture punishment

9    authorized by law in this case.

10          Thank you.

11          **THE COURT:**  Anything, Ms. Nowalk?

12          **MS. NOWALK:**  I'm sorry?

13          **THE COURT:**  Anything from you?

14          **MS. NOWALK:**  Nothing further, Your Honor.

15          **MR. PETRUZZI:**  Nothing further, Your Honor.

16          **THE COURT:**  Counsel, come forward, please.

17       (Discussion at sidebar on the record.)

18          **THE COURT:**  Mr. Petruzzi, I understood that you were

19    not going to argue that the -- the fact that the money was in

20    the possession of the Secret Service was an issue for the jury.

21          **MR. PETRUZZI:**  It's not.

22          **THE COURT:**  And you -- and I don't think you intended

23    to, but you did say that the -- that the $149,100 has already

24    been provided to the Secret Service.

25          **MR. PETRUZZI:**  Yes.

1          **THE COURT:**  I am -- I'm going to propose this

2    instruction before I send them out:  The fact that the $149,100

3    has already been provided to the Secret Service has no bearing

4    on the decision.

5          Do you have any objection to that?

6          **MR. PETRUZZI:**  No, sir.

7          **MS. NOWALK:**  No objection.

8       (End of discussion at sidebar.)

9          **THE COURT:**  Ladies and gentlemen, the fact that the

10   $149,100 has already been provided to the Secret Service has no

11   bearing on your decision.

12          Please remove the jury.

13          And this is a jury verdict form.

14       (Jury exited the courtroom at 10:58 a.m.)

15          **MR. PESTANA:**  Your Honor, may I be heard?

16          **THE COURT:**  Yes, sir.

17          **MR. PESTANA:**  At the close of all evidence, we

18   renewed our Rule 29 motion.

19          **THE COURT:**  Yes.

20          **MR. PESTANA:**  Obviously, at the close of all

21   evidence that determination can be different from the one

22   that's currently under advisement by Your Honor because after

23   the close of all evidence the Court may consider the defense's

24   evidence, in addition to the Government's rebuttal evidence.

25          So I'm prepared to make all argument on that one, if

1   Your Honor would like.

2           With respect to the legal arguments to materiality

3   and wire communications, those largely remain the same.

4           Obviously, with the defense evidence and the

5   Government's rebuttal evidence, the factual elements with

6   respect to substantial evidence for a reasonable juror to find

7   that Mr. Wade was guilty beyond a reasonable doubt changes

8   because we put in evidence on that one.  So that fact inquiry

9   changes with respect to the ones currently.

10          **THE COURT:**  I thought the strongest part of the case

11  was brought up -- for the Government was the cross-examination

12  of your expert on the evidence supporting the verdict.

13          **MR. PESTANA:**  Which -- well, so -- which expert are

14  you referring to, Your Honor?

15          **THE COURT:**  Your last expert.

16          **MR. PESTANA:**  Well, so there's a number of things

17  that came up during --

18          **THE COURT:**  Well, you're telling me what you're going

19  to do, what you want to do.

20          **MR. PESTANA:**  Yes, Your Honor.

21          **THE COURT:**  Okay.  I'll take it up.  You don't have

22  to say any more.  I've got two things I owe you.  I owe you a

23  ruling on that.  I'm not sure it will happen today or tomorrow,

24  but I'll let you argue it now.

25          And I also have your motion to dismiss that I told

1    you -- I've ruled on, but I told you I would give you reasoning

2    and a written order.  So I owe you those two things.

3            I understand that.

4            **MR. PESTANA:**  Understood.  So would Your Honor --

5    would you like me to proceed on oral argument now or --

6            **THE COURT:**  No, because I expect they'll come back

7    soon and it will only be interrupted.

8            **MR. PESTANA:**  Okay.  That's fine.  Thank you, Your

9    Honor.

10        (Court was at ease.)

11           **THE COURT:**  I'll hear your argument after lunch,

12   Mr. Pestana.

13           **MR. PESTANA:**  Understood, Your Honor.

14        (Court was at ease.)

15           **THE COURT:**  We've apparently got them thinking, so

16   I'll stand by.  When they have a verdict, let me know.

17        (Recess from 11:05 a.m. to 11:13 a.m.)

18           **THE COURT:**  I understand the jury has a verdict.

19           Please return the jury.

20        (Jury entered the courtroom at 11:14 a.m.)

21           **THE COURT:**  Ms. Heard, has the jury reached a

22   decision?

23           **THE JUROR:**  Yes, sir.

24           **THE COURT:**  Would you please give the form to

25   Mr. Downey.  Thank you.

1          The special verdict regarding forfeiture reads:

2     Having found defendant Henry Troy Wade guilty of the offense

3     charged in Count 6 of the indictment, do you unanimously find

4     by a preponderance of the evidence that the property described

5     below is, was derived from, or is traceable to the proceeds of

6     wire fraud charged in Count 6 of the indictment:  Approximately

7     $149,100 seized from MidFlorida Credit Union, account

8     number 129948001, held in the name of Big Valley

9     Grille & Bistro LLC?

10          Yes.

11          So say we all.  This 24th day of September, 2024,

12    signed by the jury foreperson, Nicci Heard.

13          Anything else from the Government?

14          **MS. NOWALK:**  No, Your Honor.

15          **THE COURT:**  Sentencing is set in this matter for

16    January 8, 2025, at 10:30 a.m. here in Orlando.

17          What says the Government regarding release pending

18    sentence?

19          **MS. NOWALK:**  The defendant, to my knowledge, has done

20    well on bond in this case.  So I do not ask him to be remanded.

21    Excuse me.

22          **THE COURT:**  Okay.  You will not be remanded at this

23    time.

24          Ladies and gentlemen, if you –– if you will step

25    outside, back into the jury room, I'll be with you in a moment.

1          (Jury exited the courtroom at 11:15 a.m.)

2               **THE COURT:**  Mr. Wade, the pretrial conditions of

3     release will remain in effect pending sentencing.

4               **THE DEFENDANT:**  Understood, sir.

5               **THE COURT:**  Will all of you be back or just

6     Mr. Pestana?

7               **MS. McCARTY:**  You have to see me again, Your Honor.

8               **THE COURT:**  Okay.  I like seeing you.

9               Okay.  We'll see you back, let's say, 1:15.  Okay?

10              Will you be back?

11              **MR. COHEN:**  You want me back?

12              **THE COURT:**  Will everybody be back?

13              **MR. PETRUZZI:**  1:15 or January 15?

14              **THE COURT:**  No, this afternoon.

15              **MS. McCARTY:**  Rule 29.

16              **MR. PETRUZZI:**  Oh, yeah.  I'm not going anywhere,

17    Judge.

18              **THE COURT:**  Okay.  See you then.

19         (Recess from 11:16 a.m. to 1:12 p.m.)

20         (Court called to order.)

21              **THE COURT:**  Mr. Pestana.

22              **MR. PESTANA:**  Yes, Your Honor.

23              Good afternoon, Your Honor.

24              At this time, we're presenting oral argument in

25    support of our Rule 29(a) Motion for Judgment of Acquittal at

1   the close of all evidence.  As Your Honor knows, Your Honor has

2   reserved ruling on our Rule 29(a) at the close of the

3   Government's evidence.

4           Your Honor, just to be clear for purposes of the

5   record, Your Honor indicated earlier that there was -- you felt

6   some of the defense experts were helpful to the Government's

7   side.  So just to be clear, that would not affect the

8   pre-defense case.

9           **THE COURT:**  That's right.

10          **MR. PESTANA:**  But here we are for the defense JOA,

11  Your Honor.

12          **THE COURT:**  I understand.

13          **MR. PESTANA:**  So for -- with respect to the points

14  that support judgment of acquittal, that no reasonable juror

15  could find beyond a reasonable doubt that Mr. Wade committed

16  wire fraud in this case, similar to the three points made at

17  the first oral argument, first, insufficient evidence for a

18  reasonable juror to find that Mr. Wade knowingly made false

19  representations that were material to the SBA's decision.

20          Second, insufficient evidence for any reasonable

21  juror to find beyond a reasonable doubt that Mr. Wade is the

22  one who submitted the applications.

23          And, thirdly, this one presents both a legal and a

24  factual question.  But there's insufficient evidence for a

25  reasonable juror to find beyond a reasonable doubt that there

1    were wire communications used in this case.

2            I'll start with the materiality argument, Your Honor.

3    It's largely tracking the earlier argument on this point.  On

4    the notice of supplemental authority filed on Sunday, I cited

5    another case in which a district court granted JOA because it

6    found a lack of materiality issue.  That case is

7    *United States v. Medeiros*, M-E-D-E-I-R-O-S,

8    647 F.Supp. 3d 1130, 2022.  That's out of the district court

9    for New Mexico.  And that had to deal with whether a company

10   could represent itself as a disabled veteran small-owned

11   business.  And there was an affiliation there that the company

12   did not disclose in its application.  And the Court there found

13   the *Simmons* court that I previously cited there compelling and

14   found that there was no place on that application that required

15   the disclosure of certain underlying facts pertaining to the

16   affiliation decision.  That's at pinpoint 1165 through 1166.

17           So as a result, that court entered JOA on the fraud

18   charges.  Now, that wasn't wire fraud, as it is here, but it

19   was still a major fraud against the Government case.  So I

20   think the parallels exist there.

21           So *Medeiros*, in addition to the *Simmons* case I cited

22   previously, 441 F.Supp. 3d 1196, from the District of Kansas in

23   2020, and the *Hu* case, H-U, at 2021 Westlaw 4130515, out of the

24   Eastern District of Tennessee, all of those cases stand for the

25   proposition, Your Honor, that the defendant has to knowingly

1    make a false representation that is material to the

2    defendant's -- I'm sorry, to the victim's decision.  And it's

3    important here, Your Honor, to remember during Your Honor's

4    entire consideration of this, that wire fraud is a

5    specific-intent crime.  And that's under

6    *United States v. Connor* (ph.), 752 F.2d --

7             **THE COURT:**  I just instructed the jury on that.

8    That's fundamental.

9             Go ahead.

10             **MR. PESTANA:**  So it can't just be, Your Honor, that

11    it's a false representation.  It has to be that Mr. Wade knew

12    that the false representations were material to the SBA's

13    decision.  And if we go back to what each of these applications

14    show, there's the six -- and it's called eligibility

15    verification questions.  There are six opening questions there.

16    And then, later on in the application, there are three

17    additional questions that talk about convictions, debarment,

18    and others like that.

19             So the average layperson, if they look at those six

20    questions from the beginning and three questions at the end,

21    they think, "Okay, I check all these boxes.  I'm not

22    disqualified under these other issues.  Therefore, if I give my

23    best effort, even if there's some errors in my calculations of

24    revenue or other items, then it's not material to the SBA's

25    decision to grant the loan."

1            And I know this would come into play in our

2     forthcoming post-verdict motion for judgment of acquittal.  But

3     I think it's telling, Your Honor, that the jurors did ask about

4     items like revenue, what did the -- what was the SBA's legal

5     consideration for what constituted a grant.  That shows that

6     the jurors themselves did not know what was material to the

7     SBA's decision.  So I think it goes to show that no reasonable

8     juror could conclude, just based on the applications

9     themselves, that any errors in there were knowingly false

10    representations that were material to the SBA's decision.

11           So based on the lack of evidence to find materiality,

12    JOA is appropriate on that issue.

13           The second issue deals with insufficient evidence to

14    find that Mr. Wade is the one who, indeed, filed these

15    applications.  And there is -- in the defense evidence there

16    was a number of other items -- or a number of other individuals

17    who were proffered as people who had access to Mr. Wade's

18    finances.  Anthony James, Ms. Eubanks, Ms. Brown, even Erin

19    Horton, in a way, has access to his financial records, has

20    access to his IP address.  She said that, "I worked remotely

21    from Mr. Wade's house."  Those are all characteristics and

22    traits of someone who used his IP address to submit these

23    applications.  And there was no evidence -- or there was

24    insufficient evidence to rule those individuals out as possible

25    culprits for what happened against the SBA.

1            And so for those reasons -- and there were other

2     individuals, as well, Your Honor, that were never -- the

3     Government never addressed.  The Government never addressed

4     Kaysheila Rains.  The Government, in closing, barely addressed

5     Joseph Bivona.  Because there is no evidence about whether this

6     was committed by Joseph Bivona.

7            There was -- you know, there was this reference to

8     Jacquetta Wade and whether she was working with Mr. Wade.

9     Obviously, we preserved that issue, believe that was an

10    improper issue that was brought up.  But, either way, there was

11    insufficient evidence to rule out that Jacquetta Wade committed

12    this issue.  And so with respect to that, Your Honor, there's

13    insufficient evidence.

14           And the other evidence that I would point to that

15    came out in the defense's case is expert witness -- IP address

16    expert Robert Rohr, who said that anyone could have been using

17    the IP address from Home Telecom that was associated with

18    Mr. Wade.

19           Expert Tom Simon discussed -- discussed what's a part

20    under the umbrella of fraud and said it could include employees

21    defrauding businessmen and family members.  And that's --

22    that's consistent with Jacquetta Wade, consistent with Anthony

23    James, and all these other individuals that Erin Horton herself

24    named.

25           There's evidence that shows there were other signors

1    on the account.  The date of Jacquetta Wade being added to the

2    Amazon account and then those purchases starting thereafter, is

3    indicative or consistent with the theory that it was Jacquetta

4    Wade, acting on her own accord, while Mr. Wade was temporarily

5    disabled and dealing with trying to keep the businesses afloat.

6          And there was no evidence conclusive that shows

7    Mr. Wade was the one who electronically signed the loan

8    agreements.  That's expert witness Kevin Kulbacki who said that

9    he could not conclude one way or the other who signed these

10   loan documents and loan agreements electronically and that they

11   were used using default signatures, that you just type in Henry

12   Wade or Troy Wade, and those are the types of signatures that

13   come up on the loan agreement.

14         Now, on cross-examination Ms. Nowalk, I think,

15   muddied the waters in terms of what signatures are at issue

16   here.  The only signatures that are truly at issue are the

17   signatures on the loan agreements and -- that's it, on the ones

18   that are loan agreements.  And Kevin Kulbacki said you can't

19   tie that to any individual.

20         There were additional safeguards that the SBA could

21   have implemented, Your Honor, but did not do so for whatever

22   reason.  There was no evidence entered as to why SBA did not

23   decide to implement access control or other items that would

24   have firmly established who it was that sent these loan

25   agreements and signed them electronically.

1          So on that second point, there's insufficient

2     evidence to find beyond a reasonable doubt that Mr. Wade is the

3     one who signed -- who was the one who submitted these loan

4     applications.

5          And finally, Your Honor, on the third point, there is

6     insufficient evidence to find -- for a reasonable juror to find

7     beyond a reasonable doubt that Mr. Wade caused a wire

8     communication to be transmitted in interstate commerce.

9          Your Honor, and on this point, the language of the

10     indictment is important.

11          Page 1 -- I'm sorry, page 5 in the indictment.  It

12     says what the date of the wire is, and it says what the

13     description of the wire is.  The description, as put forth by

14     the Government, is the electronic deposit alone.  And an

15     electronic deposit communicates nothing.  The Eleventh

16     Circuit's pattern instruction, which Your Honor used for the

17     jury instructions, says that there must be some wire by

18     communication.  There must be some communication.

19          And, Your Honor, I -- you know, admittedly, I'm at a

20     boutique law firm, Your Honor, so I don't have the resources as

21     the Supreme Court does.  But pulling the dictionaries that I

22     have access to, not a single one of these shows that an

23     electronic deposit would constitute a communication.

24          A communication -- and this is under the *American*

25     *Heritage Dictionary, Fifth Edition*.

1          The definition of communication there:  The act of

2     communicating.  The exchange of thoughts, messages, or

3     information, something communicating, a system for

4     communicating.

5          Similarly, Your Honor, under the *Merriam Webster's*

6     collegiate dictionary, Eleventh edition, Communication:  An act

7     or instance of transmitting, information communicated, a verbal

8     or a written message --

9          **THE COURT:**  What was the first one?

10          **MR. PESTANA:**  An act or an instance of transmitting,

11     Your Honor.

12          And, Your Honor, if we look at the definition of

13     deposit under these same ones, none of these shows any

14     interplay with communication.

15          Under *American Heritage Dictionary*, the definition of

16     deposit, Your Honor, to put or set down.  To lay down by a

17     natural process; to place for safekeeping as in a bank; to give

18     as partial payment or security something entrusted for

19     safekeeping as money in a bank; the condition of being

20     deposited; a partial or initial payment of a cost or debt;

21     something deposited.

22          Nothing there, Your Honor, discusses how that is a

23     communication.  What does setting money in -- there's no

24     communication.

25          But, also, Your Honor, just to go back to the -- what

the indictment says, it says:  The electronic deposit is the

wire -- is the wire.

The Eleventh Circuit instruction says it has to be

some wire by communication.  So even if we wanted to accept the

possibility that the bank wire could be the wire on the

Eleventh Circuit pattern instructions, what is the

communication?  I ask -- I asked Ms. Nowalk, what is the

communication?

Now, if Your Honor actually looks at -- one moment,

Your Honor.

(Court was at ease.)

**MR. PESTANA:**  The other case that I cited with

respect to materiality is actually quite telling on this point.

This is *United States v. Hu* again, 2021 Westlaw 4130515.  And

if Your Honor looks at pinpoint star one, it has what the

indictment lists as the description of the wire.  And I'll just

read it out from the case.

It says:  Count 1.  Date, October 20th, 2016.

Description of wire:  Email transmitting the cost reimbursement

with an educational institution subcontract regarding JPL

subcontract number -- from UTK in Tennessee to JPL in

California.

Count 2.  It has the date.  Description of wire:

Email transmitting that NASA grant and cooperative agreement.

Count 3.  The description of the wire:  Invoice

1       number requesting payment of $5,000 transmitted.

2              So in each -- and this is from who?  So this shows

3       the, okay, the wire is the email being sent.  But that wire

4       contains a communication.  This one concludes the cost

5       reimbursement, the grant information, the invoice number.

6              If there was some allegation in the indictment that

7       says, "It's the bank wire, and that bank wire includes a memo

8       that says, 'This is for SBA loan,'" or whatever, something like

9       that, or if there's an allegation saying that the SBA bank

10      called MidFlorida and said, Mr. MidFlorida [sic], wire incoming

11      from Mr. Wade's account.  Then you have both the wire and you

12      have the communication.  That's not alleged in the indictment.

13      And it goes back to the Court cannot expand the indictment now,

14      at this point, to allow that as a basis to convict.

15             There's nothing being communicated in a deposit.

16      That -- and it's notable -- I'll take a step back, Your Honor,

17      to keep in mind that the Wire Fraud Act was passed, Your Honor,

18      in 1955.  Remote deposits, Your Honor, did not become legally

19      acceptable in the United States until 2004 under the Check

20      Clearing Act for the 21st Century.  That's 12 U.S.C. 5001.

21             So although I'm using modern dictionaries,

22      Your Honor, to show that a deposit cannot be communication, you

23      actually have to look at the dictionary definitions at the time

24      it was passed in 1955.  And it shows that the fact that remote

25      deposits were not even legal in 2004; there's no way that the

1    drafters or the legislature thought that electronic deposits

2    would constitute wire communications in 1955.  And it tracks

3    with what wire fraud was meant to do in the first place.

4         Wire fraud was meant to clean up the cracks of mail

5    fraud.  That's what it was supposed to do, and mail fraud

6    includes communications.  No one can dispute mail includes

7    communications.

8         So wire fraud must have a wire and a communication.

9    The Eleventh Circuit instruction is clear on that point.  And

10   to go back to the point, an electronic deposit alone

11   communicates nothing.  It's an error in the indictment.  And no

12   reasonable juror could find a communication in this case that's

13   associated with any one of these six counts, Your Honor.

14        And then also, Your Honor, we would just -- we do

15   reserve the legal arguments with respect that a bank wire's

16   loan can't constitute wire communication.  But it's also a

17   question of evidence, Your Honor.  There's nothing in here

18   that's been entered into evidence showing what was communicated

19   on these six dates that are alleged in the indictment.  There's

20   nothing communicated.  It's just money being deposited.  And

21   under any definition of communication or deposit, there's no

22   interplay between the two.

23        And so because a deposit cannot be a communication

24   for evidentiary or legal purposes, there's insufficient

25   evidence to convict on that point, Your Honor.

1          So unless Your Honor has any questions, I do have

2     copies of any cases that I've cited here if Your Honor would

3     like one.

4          **THE COURT:**  I have one question for you.

5          **MR. PESTANA:**  Yes, Your Honor.

6          **THE COURT:**  Do you have case law contrary to what

7     you've just argued?

8          **MR. PESTANA:**  On the wire communications?

9          **THE COURT:**  On anything?

10         **MR. PESTANA:**  Do I have case law contrary?

11         Okay.  So on the materiality, I did not see anything

12    that contradicted that.

13         **THE COURT:**  So are there any district court opinions

14    addressing that?

15         **MR. PESTANA:**  Materiality --

16         **THE COURT:**  Other than the ones you cited?

17         **MR. PESTANA:**  I did not see any, Your Honor.  I mean,

18    like I said, I'm at a boutique firm.  So if there's something

19    out there, please -- you know, I'm not trying to misrepresent

20    anything.  So if there's something out there, your law clerk or

21    Your Honor finds something, or Ms. Nowalk found something,

22    please, you know, don't hold that against me.  To my knowledge,

23    I did not see anything.

24         With respect to --

25         **THE COURT:**  I just wondered because it seems like

1        there are a lot of these cases, and they must be percolating

2        through the district courts to the appellate courts at this

3        point.  And I just wondered whether any had been decided that

4        addressed this issue and came to a different result.

5                **MR. PESTANA:**  So specifically with respect to the

6        COVID fraud cases that I believe Your Honor is referring to, I

7        haven't seen any yet.  So I think -- I think it's still a

8        relatively new issue that's going to be percolating upstairs to

9        the Eleventh Circuit, Your Honor.  So that's why -- looking

10       outside -- for purposes of this, I looked outside of the

11       Eleventh Circuit.  I didn't see anything there.

12               **THE COURT:**  How about the last issue?

13               **MR. PESTANA:**  The wire communications, no.  So at the

14       motion to dismiss stage, Your Honor, what the Government cited,

15       and I believe what Your Honor relied on in denying that, was

16       the fact that the Eleventh Circuit had affirmed --

17               Actually, let me just take a step back, Your Honor.

18       I do want to finish -- I want to tie up one point with respect

19       to materiality.

20               And it also plays to the third one, is that I believe

21       Your Honor might be questioning, okay, what are the

22       repercussions on this?  I think the repercussions, Your Honor,

23       is that the indictment needs to be better.  I don't think this

24       is going to be a case where if Your Honor grants JOA you're

25       opening up the floodgates for all these cases to be thrown out.

1    I think the relief here is narrow because the indictment is

2    written poorly in the sense that it talks only about an

3    electronic deposit, and it fails to say what the material -- it

4    fails in the sense that the applications themselves don't have

5    the material information.  Right?

6          So if the Government wants to be bring COVID fraud

7    charges, or they want to continue to do so, it needs to be on a

8    separate basis other than the applications themselves.  I think

9    that's going to be the big picture, repercussions here.

10          Now, going to the wire communications part, Your

11    Honor, is there case law on that point?  There's case law in

12    which the Eleventh Circuit has affirmed wire fraud convictions

13    that were based on bank wires.  However, as Your Honor knows --

14    Your Honor has sat by designation on the Eleventh Circuit.  The

15    Eleventh Circuit does not -- any appellate court does not

16    address the issues that are not brought before them.  And so if

17    there's reversible error in an appeal, but the appellant never

18    brings it up, that does not make that reversible error now good

19    law.  It just means the appellant did not bring it up.  And so

20    that's what we're doing here.  I found no Eleventh Circuit case

21    that says a bank wire loan constitutes a wire communication

22    under 1343.  The best case I found was that *Piper* case.

23          Now, I don't have it in front of me, Your Honor.  So

24    I will say I do think I saw maybe a different circuit or

25    another district court that looked at *Piper* and distinguished

1    it or disagreed with it.  So I will say that.  But nothing from

2    the Eleventh Circuit.  I feel confident saying that a wire

3    communication alone -- I'm sorry, a bank wire loan constitutes

4    a wire communication.

5            And again, Your Honor, the concern is, "Okay, well,

6    if I grant this, what does this do?  Does this open up the

7    floodgates for these cases?"  The answer is "No."  Going back

8    to my argument, Your Honor, what they could have done was say

9    it's the electronic deposit, and the electronic deposit

10   includes some form of communication from place A to place B.

11   That's the basis of it.

12           I think it's a very narrowly tailored relief we'd be

13   getting here.  It's just -- it's just a JOA on Mr. Wade's case.

14   If there's other indictments that also only allege bank wires

15   alone as the wire communication, well, then, yes, there will be

16   implication in those cases.

17           But going back to the *Hu* case that I just cited,

18   Your Honor, there they cited the email transmission and what

19   that information contained.  That case wasn't from long ago.

20   That was 2021.  I think that's a good case that's instructive.

21           And in other wire fraud cases that I've dealt with on

22   these issues, it usually contains more than just the bank

23   deposit.  There's something more.  There's some communication.

24   And that's what this indictment is lacking.  And it is also

25   lacking in terms of evidence, Your Honor.

1       So unless Your Honor has any other questions, I'm

2   happy to cede the floor to Ms. Nowalk on this point.

3           **THE COURT:**  Thank you, sir.

4           **MR. PESTANA:**  The only other point that I'd like to

5   raise, Your Honor, is that if you look at the indictments --

6   I'm sorry, the applications themselves, the only thing that's

7   clear to the applicant is that there is possible civil

8   penalties for false information.  Now, there's discussions of

9   criminal liability but the one thing that's clear to the

10  applicant is that there's civil repercussions, where not

11  criminal.  And that goes to the materiality, Your Honor.

12          Thank you.

13          **THE COURT:**  Ms. Nowalk.

14          **MS. NOWALK:**  Yes, Your Honor.

15          First, with regard to materiality.  So as defense

16  counsel just mentioned in passing before he sat down, whether

17  or not someone knows that their conduct is criminal is not --

18  it does not negate the fact that it is criminal.

19          So providing false information in order to obtain

20  money is fraud.  And so whether or not someone knew on their

21  application that they were potentially going to incur, you

22  know, perjury, civil liability, or criminal liability with

23  regard to the certification on the application does not negate

24  the fact that they knew at the time they were submitting the

25  application that if they submitted false information that was

1    material to the decision and ended up obtaining the loan and

2    ended up obtaining money through those false representations,

3    that they would be violating this statute, fraud.

4         So with regard to the materiality of the information

5    and whether the defendant knew at the time he was applying for

6    these loans that the information he was providing was material

7    to the decision of the SBA -- excuse me -- in either granting

8    or denying the applications, what we have is that the SBA

9    representatives indicated every single question on this

10   application mattered.  And so every single question the

11   defendant answered, whether truthfully or not, mattered.

12        And we have evidence presented to the jury that most

13   of those questions were incorrect regarding the business

14   address, regarding the revenues.  Because multiple applications

15   have the same business, at the same time, and different numbers

16   for revenue, large differences, hundreds of thousands of

17   dollars of differences, which is significant.  And it does not

18   show any type of error on the part of the applicant in

19   understanding the question asked of them.

20        Most notably, though, I want to talk about Exhibit 5,

21   which is the Big Valley Grille & Bistro application.  In that,

22   what we have is correspondence in that exhibit showing that the

23   SBA emailed the defendant directly asking him for verification

24   of his address and for bank statements.  These two documents

25   submitted in response to that question were fraudulent.  First,

1  the applicant, the defendant, submitted an envelope that was

2  addressed to him at Mary Louise Davis' home, which she

3  testified she does not even know him.  So that is false

4  documentation supporting his address verification for the SBA,

5  a question they directly asked him.  So he knew that's what

6  they wanted to know.

7         Another example of him providing false documents to

8  the SBA is that inside that envelope, it was purported through

9  the email correspondence that there was a bank statement from

10 MidFlorida Credit Union.  This bank statement had dates on it

11 that were approximately a year before that bank account was

12 even open.  So that is a false document.  And, again, that was

13 submitted in direct response from the SBA requesting

14 information about the bank.

15        So the defendant is not confused by the questions

16 that he was asked.  He simply provided fraudulent or false

17 information in response to these questions.

18        It is unlike the case that the defendant cited in his

19 JOA, which was about the defendant's failure to disclose a fact

20 that was never questioned, that was never asked of him by the

21 SBA.  This is different.  Every question asked of him was

22 either false -- not every question.  I retract that.

23        But every question asked of him was material.  And

24 most of those questions had false information in response and

25 direct communication with the defendant seeking more

information and clarity had false documents to support it.

So the defendant knew what was material, and he gave -- he knowingly gave false representations.

The second one is with regard to whether the defendant is the person who committed the offense. And that's the second point of the defense argument. And with regard to that, it is ruled out that no one else committed this offense because no one else benefited from it. The only person who is financially benefiting from these applications is the defendant. That was clear in all of the records that were provided to the jury before the initial JOA, and that was further clarified, as Your Honor mentioned a moment ago, through cross-examination of the defendant's witness. It shows that no one is getting money. At most, his sister got a printer and a $1,000 check, at most, out of half a million dollars that was stolen from the SBA.

So it's clear that the defendant is the person who did it because it is unreasonable to believe that someone would steal money from the SBA just to give it to the defendant, just to gift it to him. That's unreasonable. What's reasonable to believe is that the defendant did this so he would financially benefit from it as he did in this case. All of the money went into bank accounts under his name or it was funneled directly and completely into bank accounts in his name.

If other people had access to his bank accounts, he

1   was the signator and he could at any time change his

2   information, change his contact, or what have you, in order to

3   exclude other people from accessing that account.

4          So he had full control of that account.  Whether or

5   not he gave people permission to use it was up to him.

6          And he knew what was in it because he asked for that

7   money from the SBA, and he got it.

8          We also have, with regard to the IP addresses, all of

9   the applications that were submitted, all of the loan

10  agreements that were signed after May of 2020.  So that

11  encompasses Counts 4, 5, and 6.  All of those were from the

12  same IP address that he had registered to his home that he was

13  renting, same home that he was paying for, through rent

14  payments, of [sic] his personal account, 7886, which were

15  proceeds from these loans, so -- included mostly proceeds of

16  these loans.  So we know that it's him.  We know how he's using

17  the money, and we know that he is the person behind the

18  computer in all of those transactions.

19         And the ones that precede that date, we have multiple

20  pieces of evidence showing that each business had at least one

21  other application applied for, and it had completely different

22  information.  And so it shows that -- but -- forgive me -- the

23  one piece of information that was always consistent is that a

24  phone number registered to the defendant was always listed as

25  the owner of the business always, in every application.  There

1    was another phone number listed in Exhibit 6 for the business

2    address, but the owner information always contained contact

3    information that the defendant could answer if anybody called.

4            And so with regard to the wire communication, this is

5    something that we addressed earlier this year.  And my response

6    in Document 681 from February '22 -- or, February 22nd, 2024,

7    has a more complete -- it encompasses a more complete argument

8    for the case law.

9            But I did want to note some of the cases that were

10    addressed in my response.

11            Most notably, Your Honor asked if there was any

12    authority contradicting the position of wire communications and

13    how a bank transfer could communicate anything.  And what we

14    had is in the Tenth Circuit, *Bailey*, *U.S. v. Bailey*.  This is

15    327 F.3d 1131.  This is a case that I cited in my response.

16    And this is out of the Tenth Circuit in 2003.  And as I wrote

17    in my response, the Court noted that wire transfers were

18    communicative and that they conveyed information about the

19    accounts, from which and into which funds were to be

20    transferred and the amounts to be transferred.

21            And they, in fact, transferred those funds in that

22    case.  Just like in our case, there was, in fact, wire

23    communication between these two banks, between the SBA's use of

24    the U.S. Treasury and the MidFlorida bank account.  They have

25    to communicate in signals or other type of communication in

1    order to know that money is going into this account.  And, in

2    fact, money did go into those accounts on each of the dates

3    alleged in the indictment.

4           So for that reason, and for the reason that the

5    Eleventh Circuit has consistently upheld cases in which wire

6    transfers from bank accounts was sufficient in order to obtain

7    convictions in wire fraud cases, I ask that the JOA be denied.

8           **MS. McCARTY:**  Your Honor, my client has asked me to

9    bring one point to the Court.  May I briefly --

10           **THE COURT:**  What?

11           **MS. McCARTY:**  My client has asked me to address one

12    issue with the Court.

13           May I briefly respond?

14           **THE COURT:**  Yes.  Respond to the --

15           **MS. McCARTY:**  My client is asking me to clarify

16    something.  May I have a moment to speak?

17           **THE COURT:**  Yeah.  But I'm just trying to understand

18    what it is.  Are you --

19           **MS. McCARTY:**  I'd like to supplement.

20           **THE COURT:**  -- doing a rebuttal to --

21           **MS. McCARTY:**  I'd like to just supplement and -- and

22    lead rebuttal and let Mr. Pestana --

23           **THE COURT:**  This is all part of the Rule 29?

24           **MS. McCARTY:**  Yes.  Yes.

25           **THE COURT:**  Okay.

1          **MS. McCARTY:**  Your Honor --

2          **THE COURT:**  That means that Mr. Pestana is not going

3    to.

4          **MS. McCARTY:**  Can I have a moment to just explain to

5    Mr. Pestana what my client would like the Court to hear?

6          **THE COURT:**  Yes.

7          **MS. McCARTY:**  May I have a moment?

8          Okay.  Thank you.

9          **THE COURT:**  I'm going to take a moment too.

10         **MR. PESTANA:**  May I, Your Honor?

11         **THE COURT:**  Yes, sir.

12         **MR. PESTANA:**  Just to -- I spoke with Ms. McCarty.

13   And just to clarify a point, I referred to language on the

14   uncharged applications, Exhibits 6 through 11.  I just want to

15   clarify that it's clear there that if the funds are used

16   improperly, there could be a civil remedy.  So I just want to

17   be clear about that point.  But I want to go ahead and address

18   two of the points Ms. Nowalk made with respect to materiality.

19         **THE COURT:**  Hold on a second.

20         How is that germane to your argument?

21         **MR. PESTANA:**  So it's not really related, Your Honor.

22   I misspoke earlier and said that it wasn't clear about criminal

23   liability or something to that effect.  But I just wanted to

24   make sure the record is clear.  I just don't want Your Honor or

25   your chambers to go back and look, "Oh, Mr. Pestana

1    misrepresented something."  I just want to be clear that what

2    happens is in Exhibits 6 through 11, the language is that if

3    somebody obtains funds and uses it improperly, there's language

4    there that makes it clear that that's a civil remedy.  I just

5    want to -- it's just a part of clarifying the record,

6    Your Honor.

7         **THE COURT:**  But that doesn't have anything to do with

8    the offense here.  The offense here is getting the money

9    improperly, right?

10        **MR. PESTANA:**  Well, that's the allegations,

11   Your Honor.

12        So to go back to the materiality portion, Your Honor,

13   it's important in response to a couple points Ms. Nowalk

14   addressed or she brought out.  She talked about, firstly, the

15   application themselves.  And it's important to remember that

16   EIDL loan applications are different than PPP applications.

17   EIDL loan applications were completed directly by applicants.

18   It was done by the small business person or whoever was on the

19   other side.  So it is for lay people.

20        Mr. Rossmeier testified that it was not easy to

21   understand for the average person.  Now, he characterized it

22   "idiot proof," but when I asked him, "What does that mean," he

23   said, "compared to other loan applications in the industry."

24   So for your average banker or underwriter, it was pretty

25   simple.  But for your average person, he testified, as an

1    expert witness in SBA underwriting, that it was difficult for

2    your average layperson to understand and to ensure the

3    information you're putting down was material to the SBA loans.

4    So that's one point I want to bring out.

5            And, secondly, Ms. Nowalk, in rebuttal to the first

6    point about materiality, all of it was post hoc,

7    post-submission evidence.  Right?  So what -- effectively, what

8    the Government's position is, is that if we give you an

9    application that's not clear as to what's material to us and

10   you commit errors, and we decide later that questions five,

11   six, and seven were material, we can go after you.  That is --

12   that's not how it's supposed to be.  It's supposed to be based

13   on the application itself.  You look only at the application,

14   and if the application itself doesn't say these items are

15   material or these items -- or failure to --

16           **THE COURT:**  So your argument is that the -- the

17   person granting the application -- the person generating the

18   application and later considering the application, the entity,

19   whoever it is who does that, would have to say that this

20   representation, this representation, and this representation

21   are material in order for it to be material?

22           **MR. PESTANA:**  Yes, Your Honor.  Maybe not in so many

23   words, but it needs to be clear to the average person because

24   the average person maybe doesn't know what material means.  But

25   maybe they can say, "If you put wrong information on this line,

1    this is going to affect our decision or it's going to open you

2    up to criminal liability" or something to those effects.

3         **THE COURT:**  Well, if the question is whether the

4    entity actually existed, was actually an operating business,

5    and it's a business loan granted by the Small Business

6    Administration, wouldn't that be material?

7         **MR. PESTANA:**  Not from the face of the application.

8    But first off -- that's a loaded question, Your Honor.  One,

9    because all these --

10        **THE COURT:**  It's just a hypothetical.  You don't need

11   to dispute my hypothetical.

12        **MR. PESTANA:**  Sure.  But I just -- I do want to

13   address your ultimate point, because all of these businesses

14   did exist.  They all had EINs.  Now, if the information is

15   incorrect --

16        **THE COURT:**  I know that's the position you take, and

17   there's some evidence to support it.  The jury may or may not

18   have accepted it.  I don't know.

19        **MR. PESTANA:**  So, again, just --

20        **THE COURT:**  An operating business.  But I'm not going

21   to argue that.

22        **MR. PESTANA:**  Sure.  Understood, Your Honor.

23        One moment, Your Honor.

24        And so the other -- and then going to the wire

25   communications point, Your Honor, with respect to the case that

1    Ms. Nowalk cited from the Tenth Circuit, a couple things I'd

2    point out.

3           I don't have that case ahead of me.  If Your Honor

4    looks at the case, I would urge Your Honor to look at the

5    indictment itself.  I mean, that's what matters here, because

6    if that indictment includes both wire and communications

7    alleged, that makes it facially different from this case.

8           One thing I'll point out is that it's from 2003.  So

9    it's before remote deposits were even legal in this country.

10   So I suspect just by that fact alone that there's some other

11   communication alleged there.

12          The point about the electronic deposits, Your Honor,

13   is this.  If we look at the key fourth element on the Eleventh

14   pattern -- the Eleventh Circuit pattern jury instruction, it

15   says that the Government must prove beyond a reasonable doubt,

16   quote, "The defendant transmitted or caused to be transmitted

17   by wire some communication in interstate commerce to help carry

18   out" --

19          **THE COURT:**  This isn't really rebuttal.  You've

20   already argued that.

21          **MR. PESTANA:**  Well, Your Honor, because Ms. Nowalk

22   said that bank transfers alone can do it.  But it can't be both

23   by wire some communication.  Wire is the means.  So the

24   electronic is the means.

25          What's the communication?  There's been no evidence

1   of it.  Ms. Nowalk mentioned signals, evidence of signals.

2   There was no evidence about signals.  The only thing that was

3   brought out in testimony was that the SBA deposited funds in

4   the MidFlorida bank accounts.

5          What's actually most notable, Your Honor, is that

6   Mr. Maier, the Government's own witness, got up there and said,

7   "I didn't know these moneys were in there until 2021," until

8   the -- the last application money hit.  That's what he knew.

9   So if there was some form of communication, Mr. Maier would

10  have said, "Oh, yes, we knew on these dates this money hit,

11  because the SBA told us that."  But there is no communications

12  submitted to that effect, Your Honor.  And so for those

13  reasons, we submit that JOA should be granted under Rule 29.

14         Thank you, Your Honor.

15         **THE COURT:**  Keitra, would you ask Joe to bring in the

16  *Bailey* decision for me?

17         Ms. Nowalk, I'll give you surrebuttal to that narrow

18  part of the argument, whether --

19         **MS. NOWALK:**  I'm sorry, which part of the argument?

20         **THE COURT:**  The last thing he covered.

21         **MS. NOWALK:**  With regard to the communication about

22  being directly stated within the indictment?

23         **THE COURT:**  Uh-huh.

24         **MS. NOWALK:**  So the way that we structure the

25  indictments, and as Mr. Pestana said, maybe it's a point for

1    clarity in the future, but this document that was presented to

2    the grand jury where they found a true bill, and then provided

3    to the jury during the course of this trial for them to refer

4    to when reaching their verdict, this document makes it clear

5    because it has a table of all of the individual wire

6    transactions.

7           And they were able to obtain testimony during the

8    course of this trial, evidence that's presented, the bank

9    records, and seen that there were three deposits made between

10   the U.S. Treasury, through interstate commerce, and to the

11   MidFlorida bank account.

12          So it's clear which wires we're discussing.  It's

13   clear that there was this communication between two different

14   banks because it's within the table of the indictment.

15          It indicates from where and to where the wire

16   communication was -- was being communicated.  And in order to

17   obtain money into an account or to send money from an account,

18   there is communication, whether it's electronic, whether it's,

19   you know, in some type of code within the databases of these

20   systems, that's -- it's still communicative as the *Bailey*

21   decision discusses.

22          **THE COURT:**  Okay.  Thank you, ma'am.

23          It seems that the language in the *Bailey* case and the

24   indictment is the same.

25          The indictment alleged the crime of wire fraud.

1          It says:  The statute makes it illegal to transmit,

2     cause, or to be transmitted by means of wire communication,

3     interstate commerce, any writings, signs, signals, pictures,

4     sounds for purposes ...

5          They listed the transfers with the date of the

6     transfers, the same as here.

7          Okay.  I still have under advisement the motion to

8     dismiss.  Of course, if I granted that motion, all of this

9     would be moot.  But if I'm -- I'm looking at this apart from

10    the motion to dismiss, and I deny the Rule 29 motion.  I think

11    that the -- there was enough evidence for the jury to conclude

12    that the defendant was the person who perpetrated the fraud.

13         I think that the *Bailey* case answers the question

14    regarding the wording of the document, and I think that there

15    is evidence that the -- establishing the materiality of the

16    representation.  So I deny the motion.

17         Is there anything else I can -- I know I owe you the

18    order on the motion to dismiss.

19         Is there anything else?

20         **MR. PESTANA:**  Your Honor, just for the record, which

21    Rule 29 did you just deny?  Was it the --

22         **THE COURT:**  I only had one, didn't I?

23         **MR. PESTANA:**  As I understand, you took under

24    advisement the Rule 29 at the close of the Government's case.

25    And the one I just argued was --

1              **THE COURT:**  Oh, yeah.

2              **MR. PESTANA:**  Was close of all evidence.

3              **THE COURT:**  I deny it in the first instance.  To the

4      extent it was renewed, I deny that, as well.

5              **MR. PESTANA:**  So you deny both at this point?

6              **THE COURT:**  Yes.

7              **MR. PESTANA:**  Okay.  Understood, Your Honor.

8              **THE COURT:**  I deny both on all three grounds raised.

9              I think they were the same grounds in both, weren't

10     they?

11             **MR. PESTANA:**  No, Your Honor, because at the -- in

12     the second one I discussed evidence that we brought in the

13     defendant's case.  And the first one --

14             **THE COURT:**  I know, but the bases were the same,

15     weren't they?  The bases were the same, right?

16             **MR. PESTANA:**  The arguments were the same, but the

17     evidence changed.

18             **THE COURT:**  The bases were the same.  The argument

19     was a little bit different because in the latter you relied on

20     evidence from the defense, right?

21             **MR. PESTANA:**  Correct.

22             **THE COURT:**  Okay.  I understand.  They're both

23     denied.

24             Is there anything else I can do for the Government?

25             **MS. NOWALK:**  No, Your Honor.

1          **THE COURT:**  Is there anything else I can do for the

2     defendant?

3          **MR. PESTANA:**  Nothing further from the defense,

4     Your Honor.

5          **THE COURT:**  Have a safe drive back.  Thank you-all.

6          **MS. NOWALK:**  Thank you, Your Honor.

7          (Proceedings adjourned at 2:09 p.m.)

8                    **C E R T I F I C A T E**

9

10          I certify that the foregoing is a correct transcript

11     from the record of proceedings in the above-entitled matter.

12

13     October 20, 2024

14          s\  Nikki L. Peters
       _____
       Nikki L. Peters, RMR, CRR, CRC
15     Federal Official Court Reporter
       United States District Court
16     Middle District of Florida

17

18

19

20

21

22

23

24

25